1  KELLY J. BARLEAN
2  3101 NW 20th Street
   Oklahoma City, Oklahoma 73107
3  (405)326-7870
   kellybarlean@gmail.com
4  *Plaintiff Pro Se*
   By: Kelly J. Barlean, OBA #31286

**FILED**

JUN 0 5 2023

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT. WESTERN DIS. OKLA.
BY_____ *kk* _____,DEPUTY

5
6              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF OKLAHOMA

7

8  (1)KELLY J. BARLEAN,                Case No.:CIV-23-488-JD

9        PLAINTIFF.                    Judge:

10       v.

11 (1)OKLAHOMA COUNTY CRIMINAL
      JUSTICE AUTHORITY,
12 (2)TURN KEY HEALTH CLINICS,
      L.L.C.,                          COMPLAINT FOR DAMAGES
13 (3)JESSE CHILDERS,                  AND DECLARATORY AND
   (4)DUSTIN WILLIS,                   INJUNCTIVE RELIEF
14 (5)TAYLOR GARCIA,
15 (6)BRANDON LEE,
   (7)DAMEN JACOBSEN,
16 (8)ADRIAN DOMINGUEZ SOLIS,
   (9)JORDACHE ROE,
17 (10)BRITNEY PETTIT,
18 (11)BUTCH BROCK
   (12)MARK WINCHESTER,
19 (13)JOHN AND JANE DOES 1-12.

20       DEFENDANTS.

21
                    **COMPLAINT** Page **1** of **142**

1   COMES NOW, the Plaintiff *Pro Se*, KELLY J.

2  BARLEAN, upon personal knowledge and upon

3  information and belief, alleges the following:

4

5                    **INTRODUCTION**

6    On June 7, 2021, the Plaintiff, Mr. Kelly J.

7  Barlean, OBA #31286, was a sixty-year-old attorney

8  in good standing and a 100% disabled veteran

9  **(EXHIBIT A)** when the Oklahoma City Police

10 Department (hereinafter "OCPD") was dispatched to

11 his home after his former girlfriend called 911

12 following an argument with Mr. Barlean.  When the

13 police arrived with brandished weapons, they

14 immediately seized Mr. Barlean by placing him in

15 handcuffs and taking him directly to the back seat

16 of a patrol car.  Mr. Barlean remained handcuffed

17 for two hours with the first ninety minutes spent in

18 front his neighbors and the last half hour in the

19 back seat of a patrol car getting a "Rough Ride" to

20

21

1 | the Oklahoma County Detention Center (Hereinafter
2 | "OCDC").

3 |     Mr. Barlean had the honor and privilege to
4 | serve as the City Attorney and Municipal Prosecutor
5 | for the Colorado Home Rule City of Sterling for
6 | eight years.

7 |     During the two hours, Mr. Barlean effectively
8 | articulated his displeasure with the Defendant
9 | Officers' lack of professionalism and provided them
10 | with unfiltered and unsolicited performance
11 | evaluations.

12 |     Mr. Barlean educated the officers with a vocal
13 | delivery honed by three years as an upperclassman at
14 | the United States Air Force Academy, as a United
15 | States Army Infantry Officer posted to the 101st
16 | Airborne Division and as the Vice Chairman of the
17 | Appropriations Committee of the Washington State
18 | House of Representatives.

19 |     Mr. Barlean's lack of measured candor resulted
20 | in his warrantless arrest, the warrantless search of

21 |

1  his home, and the warrantless seizure of his

2  firearms by the OCPD.

3      Mr. Barlean was incarcerated for eight days at

4  OCDC.  The Oklahoma County District Attorney

5  declined to file any charges against Mr. Barlean

6  **(EXHIBIT B)**.  During the booking, Mr. Barlean was

7  erroneously classified as an unaffiliated gang

8  member and was housed in the Maximum-Security Gang

9  Pod where he was twenty to forty years older than

10  the other inmates.

11     While incarcerated at OCDC, Mr. Barlean was

12  denied use of a prosthetic respiratory device

13  commonly known as Constant Positive Airway Pressure

14  (hereinafter "CPAP") machine for his severe

15  Obstructive Sleep Apnea.  The medical staff would

16  not allow him to use his own CPAP or provide him

17  with a substitute.

18     Mr. Barlean almost had a stroke due to

19  constant, critically high blood pressure caused by

20

21

1  lack of sleep and for experiencing prolonged,

2  unrelenting fear.

3      Mr. Barlean was forced to enter the jail

4  wearing his large 14k gold United States Air Force

5  Academy (hereinafter "USAFA") class ring

6  approximately $3,500 U.S. Dollars.  **(EXHIBIT C)**.

7      By the grace of God, Mr. Barlean summoned

8  skills long thought lost and fended off the excess

9  attention his USAFA ring was getting and the

10  attention he was getting from other inmates who were

11  unenthusiastic about being housed with a former

12  prosecutor.

13      Mr. Barlean frequently asked guards and medical

14  staff members to relieve him of his ring and put it

15  in storage with the rest of his personal items that

16  were taken at booking.  Mr. Barlean's requests were

17  denied as they observed the wounds on his arms,

18  hands and knuckles sustained from defending himself

19  and his ring which is still in his possession today.

20

21

**COMPLAINT** Page **5** of **142**

1             **JURISDICTION AND VENUE**

2        1.   Plaintiff brings this action pursuant to 42

3    U.S.C. §1983, 42 U.S.C. §12132 and 29 U.S.C. §794.

4        2.   Jurisdiction is proper pursuant to 28

5    U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide

6    for original jurisdiction in this honorable Court of

7    all suits brought pursuant to U.S.C. § 1983.

8    Jurisdiction is also conferred by 28 U.S.C. § 1331

9    because the claims for relief derive from the United

10   States Constitution and the laws of the United

11   States.  Jurisdiction is also conferred by 42 U.S.C.

12   § 12133 because one of Plaintiff's claims for relief

13   derives from Section 202 of the Americans with

14   Disabilities Act, 42 U.S.C. § 12132.  Jurisdiction

15   to grant Declaratory/Injunctive Relief is conferred

16   by 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

17       3.   Venue before this Court is proper under

18   U.S.C. §1391(b)(1) because all Defendants are

19   located and/or reside in Oklahoma within the Western

20   District and U.S.C. §1391(b)(2) because all events

21

1  or omissions occurred in the Western District of

2  Oklahoma.

3                        **PARTIES**

4     4.  At all times relevant to this Complaint,

5  Plaintiff, Kelly Barlean, (hereinafter "Mr.

6  Barlean"), an individual and citizen of the United

7  States of America, resides in the County of

8  Oklahoma, State of Oklahoma.

9     5.  Defendant Oklahoma County Criminal Justice

10 Authority (hereinafter "OCCJA" or "Jail Trust") is a

11 statutorily created public Trust created to assist

12 Oklahoma County in operating the OCDC.  The Jail

13 Trust is the County entity contractually tasked with

14 the management and operations, including the

15 promulgation of administrative policies at the OCDC.

16 The Jail Trust is sued under Mr. Barlean's municipal

17 liability theory under §1983 and *Respondeat Superior*

18 liability theory under Title II of the ADA.

19    6.  Defendant Turn Key Health Clinics, LLC,

20 (hereinafter "Turn Key") is an Oklahoma limited

21

**COMPLAINT** Page **7** of **142**

1  liability company doing business in Oklahoma County,
2  Oklahoma by, pursuant to contract, provides medical
3  services to OCDC inmates with limited direct
4  supervision by the OCCJA, undertaking that task for
5  profit.  Turn Key was at all times relevant hereto
6  responsible, in part, acting under color of law, for
7  providing medical services, supervision and
8  medication to Mr. Barlean while he was in custody of
9  the OCCJA.  Turn Key was additionally responsible,
10  in part, for creating and implementing policies,
11  practices and protocols that govern the provision of
12  medical and mental health care to inmates at the
13  OCDC, and for training and supervising its
14  employees. Turn Key was, at all times relevant
15  hereto, contractually endowed by OCCJA with powers
16  and/or functions governmental in nature, such that
17  Turn Key became an agency or instrumentality of the
18  State and subject to its constitutional limitations.
19  Turn Key is sued under Mr. Barlean's municipal
20
21

1 liability theory under §1983 and *Respondeat Superior*
2 liability theory under Title II of the ADA.

3     7.  Defendant Jesse Childers, (hereinafter
4 "Childers"), at all relevant times herein, was
5 acting under the color of law as an individual
6 employed as an OCPD police officer is sued in his
7 individual capacity.

8     8.  Defendant Dustin Willis, (hereinafter
9 "Willis"), at all relevant times herein, was acting
10 under the color of law as an individual employed as
11 an OCPD police detective is sued in his individual
12 capacity.

13     9.  Defendant Taylor Garcia, (hereinafter
14 "Garcia"), at all relevant times herein, was acting
15 under the color of law as an individual employed as
16 an OCPD police officer is sued in her individual
17 capacity.

18     10. Defendant Brandon Lee, (hereinafter "Lee"),
19 at all relevant times herein, was acting under the
20
21

**COMPLAINT** Page **9** of **142**

1 | color of law as an individual employed as an OCPD
2 | police officer is sued in his individual capacity.

3 |     11. Defendant Adrian Dominguez Solis,
4 | (hereinafter "Solis"), at all relevant times herein,
5 | was acting under the color of law as an individual
6 | employed as an OCPD police officer is sued in his
7 | individual capacity.

8 |     12. Defendant Damen Jacobsen (hereinafter
9 | "Jacobsen"), at all relevant times herein, was
10 | acting under the color of law as an individual
11 | employed as an OCPD police officer is sued in his
12 | individual capacity.

13 |     13. Defendant Jordache Roe, (hereinafter
14 | "Roe"), at all relevant times herein, was acting
15 | under the color of law as employee and/or agent of
16 | the Jail Trust and is sued in his individual
17 | capacity.

18 |     14. Defendant Britney Pettit, (hereinafter
19 | "Pettit"), at all relevant times herein, was acting
20 | under the color of law as employee and/or agent of
21 |

1  the Jail Trust and Turn Key is sued in her

2  individual capacity.

3     15. Defendant Mark Winchester, (hereinafter

4  "Winchester"), at all relevant times herein, was

5  acting under the color of law as employee and/or

6  agent of the Jail Trust and Turn Key is sued in his

7  individual capacity.

8     16. Defendant Butch Brock, (hereinafter

9  "Brock"), at all relevant times herein, was acting

10 under the color of law as employee and/or agent of

11 the Jail Trust and Turn Key is sued in his

12 individual capacity.

13    17. Defendants John and Jane Does 1 through 12

14 are sued as fictitious names, their true names and

15 capacities being unknown to Plaintiff.  When

16 ascertained, Plaintiff will amend this Complaint by

17 inserting their true names and capacities.

18 Plaintiff is informed and believes and thereon

19 alleges that each of the fictitiously named

20 Defendants were acting under color of law at all

21

**COMPLAINT** Page **11** of **142**

1  relevant times herein, as employee and/or agent of
2  the Jail Trust or Turn Key is sued in their
3  individual capacities.  Each reference in this
4  Complaint to "Defendant", "Defendants", or a
5  specifically named Defendant refers to and includes
6  all Defendants sued under that above fictitious
7  name(s).

8      18. All references to "Officer Defendants" or
9  "Defendant Officers" in this Complaint refers to all
10 defendants employed by the OCPD including unknown
11 officers Doe.

12                  **FACTUAL ALLEGATIONS**

13 ***First Two hours in Handcuffs.***

14     19. Plaintiff hereby realleges and incorporates
15 by reference the allegations contained in above
16 paragraphs 1-18.

17     20. Shortly after midnight on June 7, 2021,
18 Cynthia Minor, (hereinafter "Ms. Minor"), after an
19 evening of drinking and karaoke, arrived at Mr.
20 Barlean's home to retrieve some clothes she left
21

1  there when she moved out two days earlier when Mr.

2  Barlean broke up with her and evicted her for

3  stealing from him.  She was still livid over being

4  jilted and started an argument with Mr. Barlean.

5  After words were exchanged, Ms. Minor went upstairs,

6  and Mr. Barlean stayed downstairs watching Midnight

7  Sportscenter.  A few minutes later, he noticed in

8  his peripheral vision the muzzle of a .45 pistol

9  nearing his left temple.  Mr. Barlean proceeded to

10 disarm Ms. Minor, and in the process, there was an

11 accidental discharge in the upstairs master

12 bathroom.

13     21. Ms. Minor then called 911 and alleged Mr.

14 Barlean just tried to shoot her and that he raped

15 her the prior evening.  Mr. Barlean also called 911

16 describing what just happened and told the 911

17 operator that he did not want to file any charges

18 against Ms. Minor and that he only wanted her out of

19 his home.

20

21

22. When the Defendant Officers arrived at Mr. Barlean's property, their sidearms were unholstered, leveled with pistol lights activated.  They could see from the front lawn through the open front door and locked glass storm door that he was alone, unarmed, wearing a t-shirt and gym shorts while standing and speaking into his cell phone. **(VIDEO FILE SOLIS #1 @ 2:06)**.

23.  When the police knocked on Mr. Barlean's locked glass storm door, he was still speaking into his cell phone.  The knock caught his attention and he excitedly waved at them to come inside as he approached the door. As he was unlocking the door, Mr. Barlean was commanded to step outside by Solis. Once on the front porch, he was ordered to turn around and put his hands behind his back. Solis and Jacobsen each grabbed and pulled an arm of Mr. Barlean's behind his back as Garcia handcuffed him. He was then immediately "Perp Walked" in front of

1 the neighbors to the back seat of Solis' patrol car.

2 **(VIDEO FILE SOLIS #1 @ 2:10).**

3    24. Mr. Barlean was upset and could not believe

4 he was being indisputably placed under arrest with

5 handcuffs and confined in the back seat of a police

6 car.  When he asked why he was being arrested, the

7 Officer Defendants obfuscated by telling him that he

8 was not under arrest and that was only being

9 detained but refused to answer Mr. Barlean's queries

10 as to why he was being detained.

11    25.  Mr. Barlean told Solis that his back and

12 his titanium knee were becoming increasingly more

13 painful and that his claustrophobia was making him

14 sick, and he needed to vomit.  Solis then opened a

15 back door and allowed Mr. Barlean to sit with his

16 legs outside the vehicle then began dry heaving.

17 After fifteen minutes, Mr. Barlean's pain level

18 increased and Solis had Mr. Barlean sit on the curb

19 in front of a neighbor's home.  His pain kept

20 escalating and begged to be taken to jail.  Solis

21

1   then had Mr. Barlean alternate rotate around sitting

2   in the patrol car, lying face down on his driveway

3   and sitting on the neighbor's curb until he was

4   transported to OCDC.

5       26.  During the two hours he was handcuffed, Mr.

6   Barlean gave the Officer Defendants gratuitous,

7   unsolicited professional performance evaluations

8   laced with vituperative epithets.  As Mr. Barlean's

9   pain increased, the more condescending and

10  insightful his commentary became, and, the more he

11  presented as a supercilious jerk.

12      27.  The Officer Defendants finished getting

13  statements from Ms. Minor and Mr. Barlean less than

14  a half hour after their arrival.  No neighbors were

15  asked if they heard a gunshot earlier that evening

16  nor did the police gather any physical evidence from

17  Mr. Barlean's home because they lacked a warrant.

18      28.  Mr. Barlean remained handcuffed another

19  ninety minutes after the investigation concluded.

20

21

**COMPLAINT** Page **16** of **142**

1      29. Solis asked Mr. Barlean if he could

2    retrieve the two handguns that were involved in the

3    incident.  Mr. Barlean sarcastically granted him

4    permission to open the door, take one step, retrieve

5    the guns, turn around and exit.  Mr. Barlean chided

6    Solis asking why he was suddenly concerned about the

7    loaded handguns he saw through the door and told him

8    that his competent police officers in Sterling,

9    Colorado would have immediately secured the weapons

10   and conducted a protective sweep a half hour ago as

11   he was being arrested and handcuffed on the front

12   porch.

13      30. Solis later asked again if he could look

14   around at the rest of the house and Mr. Barlean

15   continued to deny permission.  A few Minutes later,

16   Officer Solis asks Mr. Barlean if he had his wallet

17   with him to which he replied in the negative.  After

18   a few more minutes, Solis then returned and asked

19   Mr. Barlean to tell him where his wallet was inside

20   the house and that he would go inside the house and

21

1   retrieve it for him.  Mr. Barlean declined the

2   offer.

3        31.  Mr. Barlean conveyed his contumelious

4   permission denial to Solis and saw an exponential

5   rise in the Officer Defendants' annoyance and

6   disdain for him.

7        32.  Mr. Barlean asked Solis when the police

8   reports would be available from the OCPD Records

9   Department.  Solis responded with:

10            "Shouldn't you know?
              You seem to know everything else.
11            I thought you were so smart."
              **(VIDEO FILE SOLIS #2 @ 7:50)**.

12

13       33.  Mr. Barlean was in excruciating pain and in

14  severe mental distress and kept asking the officers

15  every ten minutes what the delay was about and

16  received no response until he had been in handcuffs

17  for an hour when he was informed Supervising Officer

18  Childers, was on enroute to the scene.

19       34.  Childers arrived approximately one hour

20  after Mr. Barlean was handcuffed and placed in the

21  back of a patrol car.  No attempt was made by the

**COMPLAINT** Page **18** of **142**

1  Officer Defendants to procure arrest or search
2  warrants during that time.  When Childers arrived,
3  Mr. Barlean refused to tell him what happened that
4  evening but, in searing pain, Mr. Barlean released a
5  torrent of observed inadequate training deficiencies
6  of his subordinates and let him know that it was his
7  fault.

8      35. Mr. Barlean told Childers his leadership
9  exposed his subordinates to unacceptable risk of
10 harm because they were so intent on arresting him,
11 they forgot the fundamentals of officer safety by
12 failing to secure the guns and conduct a protective
13 sweep as they were handcuffing Mr. Barlean.

14     36.  Childers quit speaking with Mr. Barlean
15 after he inquired whether Childers could even do one
16 pull-up.

17     37. In a matter of minutes after inquiring
18 about pull-ups, Lee, Garcia and Childers, without a
19 search warrant, consent or probable cause or exigent
20 circumstances entered Mr. Barlean's home and made
21

1  video recordings of the private and personal areas
2  of his home including the contents of his bathroom
3  medicine cabinet with both their BWCs and their
4  personal cell phone cameras.

5      38. Childers, Garcia and Lee conducted a faulty
6  search.  They looked in areas where guns would not
7  be typically associated, like medicine cabinets, and
8  did not look in logical places that took too much
9  effort, like the attic.  When Lee told Childers that
10 he observed a gun safe in the garage, Childers
11 responded, "You don't have to worry about that."
12 **(VIDEO FILE RAY #3 @ 8:55)**.

13     39. After the search, the Officer Defendants
14 seized and confiscated several firearms that were
15 not involved in the incident in violation of 22 OK
16 Stat § 22-60.8 (only the guns used in a domestic
17 incident shall be confiscated) and placed them in
18 the trunk of a patrol car.

19     40. In his report, Detective Willis put in his
20 report the Lee noted that the guns were being taken

21
            **COMPLAINT** Page **20** of **142**

1  from Mr. Barlean's home for "safekeeping".

2  **(EXHIBIT D)**.  This form of "safekeeping" is in

3  direct violation of the Oklahoma City Police

4  Department Manual Fifth Edition Section 254.30

5  Securing Weapons which specifically states:

6         "… guns temporarily seized during search
       that were not used in the domestic violence
7         incident shall be returned to the owner or
       remain at the scene."
8

9      41. Lee's report states that the weapons were

10  confiscated due to domestic issues (ostensibly to

11  keep Ms. Minor safe when Mr. Barlean was released

12  from jail).  The Officer Defendants did not attempt

13  to procure a warrant to confiscate for "safekeeping"

14  the firearms contained in the gun safe to protect

15  Ms. Minor when Mr. Barlean was released from jail.

16      42. Childers, when he arrived on scene, did not

17  bring with him any new evidence to add to the

18  collective knowledge of evidence the other officers

19  had in their possession when their investigation

20  concluded a half hour earlier.

21

1     43. A half hour before Childers arrived,

2 Officer Jacobsen told Mr. Barlean, that in his

3 opinion, he did not think anyone was going to jail.

4 **(VIDEO FILE JACOBSEN #1 @ 36:20)**. He also informed

5 Mr. Barlean that Ms. Minors' stories "are not adding

6 up" **(VIDEO FILE JACOBSEN #1 @ 9:01)** and that "her

7 story's isn't really making sense." **FILE JACOBSEN**

8 **#1 @ 14:05)**.

9

10     44. Lee put in his report that Ms. Minor "had a

11 strong odor of an alcoholic beverage coming from her

12 breath and person also." **(WILLIS REPORT PAGE 4)**.

13     45. Ms. Minor, unlike Mr. Barlean, has a

14 history of criminal violence. She was charged with

15 felony assault and battery with a deadly weapon in

16 Texas when she tried to shoot her former boyfriend

17 but pled to a misdemeanor assault. **(EXHIBIT E)**.

18     46. Ms. Minor's speech was rambling. Garcia

19 and Jacobsen had to stop Ms. Minor numerous times

20 during the interview in mid-answer and steer her

21

1  back to the posed question.   Ms. Minor also kept

2  repeating to 911 operators and to the officer

3  defendants that it was her word against Mr.

4  Barlean's.

5      47. Willis' report contained three different

6  versions of events Ms. Minor gave that evening and

7  Jacobsen's report contained a fourth version.

8      48. Mr. Barlean's upstairs bathroom is 12'

9  wide. There are two entry doors on each side of the

10  bathroom with one leading to a bedroom and the

11  hallway. Ms. Minor gave one version of events where

12  she stated that Mr. Barlean pulled a gun on her in

13  the upstairs bathroom, so she fled to the adjacent

14  bedroom and grabbed a .45 pistol and ran back into

15  the bathroom, but he was not in there.

16      49. Ms. Minor said she then ran across the

17  bathroom, looked out the other door, saw Mr. Barlean

18  in the hallway and pointed her gun at him.  One of

19  her versions said Mr. Barlean lunged at her and

20  jumped on her, but she said she was able to raise

21

**COMPLAINT** Page **23** of **142**

1 │ her arm and block Mr. Barlean's arm and then the gun
2 │ went off and the bullet went into a cabinet, through
3 │ it and up into the ceiling.

4 │    50. The bullet entered the cabinet almost
5 │ vertically. The cabinet entry point was 72" above
6 │ the ground and the entry point into the ceiling was
7 │ 5" inches off perpendicular from the cabinet entry
8 │ point. **(EXHIBIT F)**. However, the cabinet with a
9 │ bullet hole is on the wall with the doorway leading
10 │ into the bedroom.  Ms. Minor said she was aiming at
11 │ Mr. Barlean while he was in the hallway when he
12 │ lunged into the bathroom and the gun went off.  The
13 │ problem is that the gun discharged on the opposite
14 │ end of the bathroom.  It would defy the Laws of
15 │ Physics for a bullet to travel 8-9 feet, enter the
16 │ cabinet at 72" from the ground, pivot almost 90
17 │ degrees and enter the ceiling 5" off perpendicular.

18 │    51. Solis gave Mr. Barlean a "Rough Ride" to
19 │ OCDC.  With his hands still handcuffed behind his
20 │ back, Mr. Barlean was stuffed into the back seat of

21 │

**COMPLAINT** Page **24** of **142**

the patrol car and Solis denied his request to have
the handcuffs removed or be handcuffed with his
hands in front and his request to use the seatbelt.

52. The ride to OCDC took almost a half hour,
which is twice as long as normal. Solis made
occasional sharp turns, smashing Mr. Barlean's
shoulders against the side windows and twisting his
lower back and knees.  Solis also sometimes hit the
brakes too hard and Mr. Barlean's head and face hit
the seat/cage in front of him. When they arrived at
OCDC, Solis removed the handcuffs from Mr. Barlean
whose hands and knuckles were grotesquely swollen
from being in handcuffs behind his back for two
hours.

**Eight Days in OCDC.**

53. When Mr. Barlean started the booking
process at the jail, he could not remove his USAFA
ring so he asked the Booking Officer Roe for some
soap so he could slide the ring over his knuckle.
Solis was standing next to Roe and overheard Mr.

1 Barlean.  Solis and Roe had a brief, whispered
2 conversation then Solis left the room and walked
3 back in after a couple minutes carrying his cell
4 phone in hand.

5     54. Solis again quietly conferred with Roe who
6 then ordered Mr. Barlean to keep the ring on and
7 commanded him to walk through the metal detector
8 into the secure part of the jail.

9     55. During the medical intake, Mr. Barlean told
10 Nurse Pettit that he had severe sleep apnea and has
11 been using a CPAP machine since 1999. After
12 answering all Nurse Pettit's questions, Mr. Barlean
13 was assigned to General Population.

14     56. The evening of June 8, 2021, Mr. Barlean
15 made a call from his cell for emergency medical
16 services as he believed that he was starting to have
17 a stroke because Mr. Barlean had not used a CPAP in
18 forty-eight hours and knew his blood pressure was at
19 a level that he had to go to the emergency room as
20
21

**COMPLAINT** Page **26** of **142**

1 he was hearing a loud ringing noise in his ears and
2 getting tunnel vision.

3      57. Mr. Barlean was taken to the infirmary and
4 Nurse Brock found Mr. Barlean's blood pressure to be
5 150/110 and five days later it was up to 180/102.
6 **(EXHIBIT G)**.  Mr. Barlean told Brock that his blood
7 pressure was high because he had severe sleep apnea
8 and has been on a CPAP machine since 1999. Mr.
9 Barlean begged Brock for a CPAP who told him that
10 CPAPs are not provided to inmates.  With no sense of
11 urgency to Mr. Barlean's condition, Brock told him
12 that he could use his CPAP machine if someone
13 brought it to him.  He informed Brock that his
14 former spouse tried to drop off his CPAP, but the
15 jail refused to accept it because she did not have a
16 prescription for it. Brock told Mr. Barlean that he
17 would make him a Priority 1 appointment to see the
18 Medical Director to see if anything could be done.
19      58. Mr. Barlean was in his cell alone when he
20 returned from the infirmary after almost having a
21

1  stroke.  In the early morning hours, he received a
2  cellmate who was screaming and pounding on the door
3  after it was closed.  An hour later after he calmed
4  down on the upper bunk, he asked Mr. Barlean how he
5  smuggled the ring inside the jail and asked to see
6  the ring.  Mr. Barlean declined, and the cellmate
7  made an aggressive move towards him.  Mr. Barlean
8  was forced to engage in unarmed combat to protect
9  himself and the ring.

10     59. The next morning, Mr. Barlean was given the
11 results of the Classification Officer's
12 determination of what level of security was
13 appropriate for him – Maximum Security Gang Pod.  A
14 guard later told Mr. Barlean that the reason he was
15 being housed there was because he was classified as
16 an unaffiliated gang member.  When the guard tried
17 to place Mr. Barlean in his assigned cell, he found
18 the cell full with two inmates on the bunkbed and
19 one on the concrete floor with a mattress pad.
20 Then the guard then tried to place Mr. Barlean into
21

**COMPLAINT** Page **28** of **142**

the adjacent cell but it was similarly overcrowded.
The next cell had a vacant concrete floor with no
mattress pad for Mr. Barlean.

60. After three nights on the concrete floor, a
Peckerwood gang member was being released and was
carrying his pad down the hall.  Mr. Barlean yelled
at the escorting guard and asked if he could have
the mattress pad.  The guard opened the cell door
and handed Mr. Barlean the still warm mattress pad
that he would be using for the next four nights.
Mr. Barlean tried to clean some of the bedbugs off
the mat, but at that point, it really did not matter
anymore.  **(EXHIBIT H)**.  Also, the guards often lost
track of where Mr. Barlean was within the Maximum-
Security Gang Pod.  The nurses alone documented that
they could not find Mr. Barlean to give him medicine
or check his vital signs on at least eight occasions
during his stay.  **(EXHIBIT I)**.

**COMPLAINT** Page **29** of **142**

1      61. Mr. Barlean observed guard John Doe #2
2   telling two UAB gang members "The old guy is a
3   prosecutor.  He got paid to put people in jail."

4      62. After being identified as a prosecuting
5   attorney, Mr. Barlean was threatened with severe
6   bodily harm and rape by other inmates.  Mr. Barlean
7   was scared.

8      63. Mr. Barlean was forced to defend himself
9   almost daily.

10     64. Mr. Barlean met with Winchester who
11  examined Mr. Barlean and saw the many bedbug bites
12  he had all over his legs.  He told Winchester about
13  the extra attention he had been receiving because of
14  his ring, pulled the ring off his finger and tried
15  to hand it to the doctor for safekeeping – which he
16  refused saying he could not do it but would ask
17  around.

18     65. Mr. Barlean told Winchester that his former
19  spouse tried to drop off his CPAP, but the OCDC
20  would not accept it without a valid prescription and

21

**COMPLAINT** Page **30** of **142**

1  then asked him for a CPAP from the infirmary.

2  Winchester told Mr. Barlean that there were no CPAPs

3  inmates could borrow due to budgetary constraints.

4      66. Winchester saw Mr. Barlean on the seventh

5  day of his incarceration without a CPAP and still

6  running on adrenaline staying alert to stay alive.

7  Winchester noted that Mr. Barlean was "shakey [sic]

8  and weak." Winchester put in his notes that if Mr.

9  Barlean was not released the following week, he was

10 going to contact the VA Hospital and request a CPAP

11 prescription from them instead of writing one

12 himself so Mr. Barlean's former spouse would be able

13 to drop off the CPAP at OCDC that day.

14 *Kelly's devastating injuries.*

15     67. Mr. Barlean experienced and survived, by

16 the grace of God, a sequence of traumatic events at

17 the hands of Oklahoma state actors that no citizen

18 of the United States of America should ever have to

19 endure.

20

21

**COMPLAINT** Page **31** of **142**

1       68. Surviving the punishment meted out by the
2  OCPD and the OCDC for exercising his right to Free
3  Speech came at a very high cost to Mr. Barlean.  He
4  was medically discharged from the U.S. Army in 1989.
5  The Department of Veterans Affairs rated Mr. Barlean
6  as 100% disabled in 2011.

7       69. Mr. Barlean was handcuffed with his arms
8  behind his back for two hours.  The pain from his
9  pre-existing military injuries was excruciating and
10 Mr. Barlean kept asking what the delay was for and
11 begged on multiple occasions to be tased or taken to
12 jail immediately for pain relief.  Mr. Barlean's
13 shoulders were sore from the Rough Ride to jail and
14 wrists were grotesquely swollen, which left red
15 marks on parts of his wrists for over a week.

16      70. Mr. Barlean received multiple abrasions and
17 bruises on his body and experienced physical pain
18 and terror while defending himself.  All vestiges of
19 physical injuries (except for the bedbug bites)
20
21

**COMPLAINT** Page **32** of **142**

1  dissipated within two weeks of being released from

2  OCDC.

3      71. Mr. Barlean survived by tossing the

4  therapeutic gains he made in the management of his

5  PTSD for the last decade by having to devolve into a

6  racist "ThugNasty" persona in order to protect

7  himself in the Maximum-Security Gang Pod where he

8  was twenty to forty years older than the

9  gangbangers.

10     72. After he was released from OCDC, Mr.

11 Barlean, for the first time in his life, believed

12 that he was truly free and had nothing left to lose

13 and descended down a dark, self-destructive path.

14     73. Before the grace of God allowed Mr. Barlean

15 to regain his mental management ability, he began to

16 drink alcohol heavily and become more aggressive.

17 The darkness caused Mr. Barlean to spend thousands

18 of dollars in legal fees, bail bond fees, and court

19 costs when he was charged in August 2021 with

20 violating 21 O.S. 644(J) - FELONY DOMESTIC ASSAULT &

21

1  BATTERY BY STRANGULATION (Case No. CF-2021-3557) to
2  which he pled guilty after the charge was reduced to
3  a misdemeanor and in December 2022, Mr. Barlean was
4  charged and pled guilty to violating 21 O.S. 644 -
5  MISDEMEANOR DOMESTIC ASSAULT & BATTERY (Case No. CM-
6  2022-4468).

7     74. Mr. Barlean now has a reputation for being
8  a burglar, embezzler and inaccurate wife shooter and
9  his former friends and associates avoid him and/or
10 fear him.  He is *persona non grata* in Republican
11 Party circles and has lost his personal identity and
12 self-definition due to the Defendant Officers
13 maliciously labeling him a threat to the taxpayers'
14 tax dollars.

15    75. Mr. Barlean's drastic change in temperament
16 also severely impacted his relationship with his
17 children.  They no longer have any communication
18 with him.  Mr. Barlean's children have not stayed
19 with him in his home or met him at a restaurant
20 since the June 2021 incarceration at OCDC.  Mr.
21

Barlean was not invited by his son to attend his Commencement Ceremony at the University of Oklahoma and, the following year, his daughter did not invite him to her University of Oklahoma graduation.

76. Mr. Barlean was arbitrarily and maliciously stripped of his honor. In the process, he became the only graduate of the United States Air Force Academy since the Viet Nam War to endure unspeakable conditions of confinement in filth, squalor, and gratuitous violence.

## COUNT ONE
### FAILURE TO ACCOMMODATE DISABLED INMATES IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. §12132) AND §504 OF THE REHABILITATION ACT (29 U.S.C. §794)
(*Against Brock, Winchester, Jail Trust and Turn Key*)

77. Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 above.

78. Mr. Barlean was booked into OCDC, a public entity, on June 7, 2021, and had his Federal statutory rights under C.F.R. § 35.152 violated by

1   being erroneously classified as an unaffiliated gang

2   member and housed in Maximum-Security Gang Pod which

3   does not allow inmates housed there to use CPAPs.

4       79.  Turn Key and Winchester violated 42 U.S.C.

5   § 12132 as they acted by reason of Mr. Barlean's

6   breathing disability when they refused to provide

7   him with reasonable accommodation (i.e., CPAP) to

8   put him on par with the other inmates without a

9   breathing disability.  "Failure to accommodate is an

10  independent basis for liability under the ADA."

11  Edwards v. Dart, 21 C 5665, 5 (N.D. Ill. Aug. 17,

12  2022).

13      80.  Mr. Barlean is a qualified individual with

14  a disability within the meaning of 42 U.S.C. §

15  12131(1) & (2) and 20 C.F.R. § 35.104.

16      81.  The Jail Trust is a public entity within

17  the meaning of 42 U.S.C. § 12131(1)(A) and 20 C.F.R.

18  § 35.104.

19      82.  On July 13, 1999, Mr. Barlean had a sleep

20  study performed in Everett, Washington to determine

21

**COMPLAINT** Page **36** of **142**

1 | whether he had Obstructive Sleep Apnea, and, if so,
2 | to what degree.  The sleep study concluded that Mr.
3 | Barlean "demonstrated a very severe pattern of
4 | obstructive sleep apnea associated with very
5 | significant changes in sleep architecture and oxygen
6 | saturation along with significant baseline hypoxemia
7 | which is not explained on the sleep data alone."
8 | **(EXHIBIT J)**.

9 |     83. 29 C.F.R. § 1630.2 includes breathing as a
10 | major life activity.

11 |     84. Mr. Barlean's sleep apnea was measured to
12 | be severe and was informed that he should use CPAP
13 | whenever he slept for the rest of his life to avoid
14 | a stroke.  The Seventh Circuit also acknowledged in
15 | a § 1983 case, that "sleep apnea can result in
16 | death."  Orlowski v. Milwaukee County, 872 F.3d 417,
17 | 423 (4th Cir. 2017).

18 |     85. Severe sleep apnea substantially limits Mr.
19 | Barlean's ability to engage in the OCDC program or
20 | activity of sleeping.  With the use of a CPAP, Mr.
21 |

**COMPLAINT** Page **37** of **142**

1  Barlean is able to participate in the program or
2  activity of sleeping similar to a non-disabled
3  inmate and participate in other programs and
4  services that he previously could not due to
5  excessive fatigue.

6      86. When Mr. Barlean does not use a CPAP, he
7  cannot sleep because his sleep apnea causes him to
8  stop breathing and have shortness of breath.  This
9  leaves him continually exhausted, stressed,
10 experiencing shortness of breath, fears for his life
11 and suffers unacceptably high blood pressure, pain
12 and discomfort, and said breathing problems
13 substantially limit the operation of Mr. Barlean's
14 respiratory functions and prevents him from
15 accessing sleep.

16     87. Mr. Barlean, or any other inmate needing to
17 use a CPAP, must have access to a CPAP and access to
18 an electrical outlet to power the prosthetic device.
19 This can only be done if they are assigned Medical
20 Housing.

21

1      88. Since he started the booking process on

2  June 7, 2021, OCDC Defendants have been on notice

3  that Mr. Barlean requires a CPAP.  The morning nurse

4  also recorded in her note that Mr. Barlean uses a

5  CPAP on June 8, 2021.  **(EXHIBIT K)**.  Turn Key and

6  the Jail Trust are vicariously liable to Mr. Barlean

7  under the doctrine of *Respondeat Superior* for

8  Winchester not providing him with a CPAP and for the

9  inaction of Brock other medical staff to be

10  identified during discovery for not notifying their

11  superiors that Mr. Barlean had a visible, immediate

12  need for a CPAP as his health was deteriorating and

13  he was in imminent threat of having a stroke.

14      89. There was no justification for Turn Key not

15  reasonably accommodating Mr. Barlean's life-

16  threatening disability by providing him with a CPAP.

17  Turn Key intentionally discriminated against Mr.

18  Barlean by being deliberately indifferent to his

19  breathing disability and refusing to reasonably

20  accommodate his disability by issuing him a CPAP so

21

**COMPLAINT** Page **39** of **142**

1  he may participate in the program of sleeping like

2  the non-disabled inmates.

3      90.  Turn Key failed to undertake a fact-

4  specific investigation to determine what constitutes

5  reasonable accommodation for Mr. Barlean and other

6  inmates with severe obstructive sleep apnea.  Turn

7  Key deliberately stopped the continuous treatment of

8  Mr. Barlean's sleep apnea by medical professionals

9  since 1999 by refusing to issue him a CPAP.

10     91.  WHEREFORE, Mr. Barlean prays the Court

11 enter judgment for compensatory and punitive damages

12 against the Jail Trust, Turn Key, Winchester and

13 Brock and, in addition thereto, the award of

14 attorney's fees and court costs pursuant to 42

15 U.S.C. §12205 and demands a trial by jury on all

16 issues so triable.

17                    **COUNT TWO**
                **DEPRIVATION OF CIVIL RIGHTS**
18       **BY FALSE ARREST/UNREASONABLE SEIZURE**
                  **UNDER 42 U.S.C. § 1983**
19               *(Against Defendant Officers)*

20

21

                    **COMPLAINT** Page **40** of **142**

92. Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 90 above.

93. Defendant Officers, while acting under color of law, violated Mr. Barlean's clearly established constitutional right under the Fourth Amendment to be free from unreasonable search seizure. Lee put in his report that when he arrived at 12:30 a.m. at Mr. Barlean's home, Mr. Barlean was already in handcuffs. **(WILLIS REPORT PAGE 3).**

94. Defendant Officers arrived at Mr. Barlean's home with weapons drawn **(VIDEO FILE RAY #1 @ (2:06),** immediately handcuffed and locked him into the backseat of a patrol car solely on Ms. Minor's 911 call without corroboration, confirmation or investigation despite observing through the locked glass storm door that Mr. Barlean was alone, unarmed, in gym clothes and waving at them inviting them to come inside his home. "In Contrast, when

1  the officers had no reason to believe the suspects
2  were or could be armed and the suspects were
3  otherwise calm and compliant, we have generally
4  concluded that the officers' conduct amounted to an
5  arrest." United States v. Soza, 686 F. App'x 564,
6  568 (10th Cir. 2017).  The Tenth Circuit in Soza v.
7  Demsich, 13 F.4th 1094 (10th Cir. 2021), held: "It is
8  unconstitutional to use forceful measures in Terry
9  stop context "absent probable cause or an
10 articulable basis to suspect a threat to officer
11 safety combined with reasonable suspicion."
12 Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir.
13 2009) (emphasis in original).

14    95. In a case remarkably like the case at
15 bar, Cortez v. McCauley, 478 F.3d 1108 (10th Cir.
16 2007), where the Court held that police did not have
17 arguable probable cause to arrest Cortez because the
18 information relied on to conduct the seizure was not
19 reasonably trustworthy information sufficient on its
20 own to justify the seizure.  In Cortez, the police
21

1 | relied, without any investigation, exclusively on
2 | the double-hearsay statement of a nurse, who had no
3 | personal knowledge of the actual facts, made to the
4 | police that the mother of a two-year-old child who
5 | said the child told her Cortez "hurt her pee-pee",
6 | and drove to Cortez's home and immediately arrested
7 | him.

8 |     96. In the case at bar, the information from
9 | Ms. Minor, upon which the Officer Defendants
10 | exclusively relied to immediately arrest Mr.
11 | Barlean, was not reasonably trustworthy information
12 | sufficient on its own to justify the immediate
13 | arrest, handcuffing and "Perp Walk" in front of the
14 | neighbors to the back seat of a patrol car –
15 | especially after what they had just observed through
16 | Mr. Barlean's locked glass storm door.  Mr. Barlean
17 | was waving at the Defendant Officers to come inside
18 | because he was a victim of Assault with a Deadly
19 | Weapon – Domestic Violence and wanted to tell them
20 | what Ms. Minor did to him earlier that evening.

21 |

1      97. Defendant Officers knew or should have

2 known the parties' criminal histories when

3 calculating the proper force posture to be in when

4 arriving at Mr. Barlean's home.  If the Defendant

5 Officers had known the parties' criminal histories

6 beforehand, they would have done exactly the

7 opposite and immediately seized Ms. Minor upon

8 arrival.  Mr. Barlean had no criminal history of

9 violence, and Ms. Minor was previously convicted of

10 trying to shoot an ex-boyfriend.  "But in

11 conjunction with other factors, criminal history

12 contributes powerfully to the reasonable suspicion

13 calculus." U.S. v. Simpson, 609 F.3d 1140, 1147

14 (10th Cir. 2010).

15      98. Mr. Barlean recognizes that governing

16 precedent holds police are entitled to base probable

17 cause for an arrest on a citizen complaint, whether

18 of a purported victim (as here) or a non-victim

19 witness, without investigating the truthfulness of

20 the complaint, unless — this turns out to be an

21

**COMPLAINT** Page **44** of **142**

1  important qualification — they have reason to
2  believe it's fishy.  Guzell v. Hiller, 223 F.3d 518,
3  519-20 (7th Cir. 2000).

4    99. Ms. Minor gave several alcohol-fueled
5  conflicting and physically impossible versions of
6  events that evening, which would lead a reasonable
7  police officer to conclude there was something
8  "fishy" afoot.

9    100.    Jacobson expressed the collective
10 knowledge of the Defendant Officers on scene a half
11 hour before Childers arrived when he told Mr.
12 Barlean that Ms. Minor's stories did not "add up" or
13 were not "making any sense" and that he did not
14 think anyone was going to jail.  **(VIDEO FILE**
15 **JACOBSEN #1 @ 9:01, 14:05, 36:20)**.

16   101.    Jacobsen's analysis and factual
17 findings are imputed to the other Defendant Officers
18 under the Collective Knowledge Doctrine.  Yet
19 somehow, after Childers arrived with absolutely no
20 additional evidence to add to their collective
21

**COMPLAINT** Page **45** of **142**

1 | knowledge, Jacobsen and the other Defendant Officers
2 | suddenly possessed sufficient collective knowledge
3 | to conduct a warrantless search of Mr. Barlean's
4 | home, arrest him without a warrant and seize and
5 | confiscated his firearms.

6 |     102.    Moreover, Defendant Officers lacked
7 | probable cause when they seized, detained, and
8 | arrested Mr. Barlean on his front porch, applying
9 | handcuffs behind his back and then immediately put
10 | him in the back seat of a patrol car.  No reasonable
11 | police officer would not be justified in concluding
12 | that Mr. Barlean was violating the law, armed,
13 | posing a threat to anyone or was a risk to flee or
14 | destroy evidence.  Officer Defendants had no
15 | particularized and objective basis for suspecting
16 | any legal wrongdoing by him or if he was a threat to
17 | officer safety.  United States v. Arvizu, 534 U.S.
18 | 266, 273 (2002).

19 |     103. No reasonable police officer would have
20 | believed that probable cause existed for the
21 |

1  immediate arrest of Mr. Barlean June 7, 2021.  This

2  is corroborated by the facts that Mr. Barlean was

3  not transported to OCDC until after he asked

4  Childers if he could even do one pull-up and that

5  the District Attorney declined to file charges

6  against Mr. Barlean despite the efforts of Willis in

7  concocting a false Incident Report chock-full of

8  material omissions and falsehoods.

9      104.     Before Childers arrived at Mr.

10 Barlean's home without any new evidence, the

11 following facts were collectively known to the

12 Officer Defendants:

13         A.  Ms. Minor told 911 and Garcia that

14             Plaintiff raped her a couple of nights

15             ago, but she never reported it. **(WILLIS**

16             **REPORT PAGE 2)**.

17         B.  Willis's report noted that Ms. Minor

18             gave three different versions of events

19             that evening.  She gave a fourth

20             version to Jacobsen.

21

        **COMPLAINT** Page **47** of **142**

C.  Ms. Minor's speech was rambling.
Jacobsen and Garcia had to stop Ms.
Minor numerous times during their
interviews mid-answer and steer her
back to the posed questions.

D.  Ms. Minor kept repeating to the 911
operator and to the Officer Defendants
that it was her word against
Mr. Barlean's.

E.  Lee noted in his report that Ms. Minor
had a strong odor of an alcoholic
beverage coming from her breath and
person also.  **(WILLIS REPORT PAGE 2)**.

F.  Officer Jacobsen's BWC footage recorded
him telling Mr. Barlean before Childers
arrived that Ms. Minor's stories "are
not adding up" (9:01), and later told
him that her story "isn't really making
sense" (14:05) and that he did not
think anyone was going to jail (36:20).

G.   While everything was still fresh in her
mind, Ms. Minor's first version of
events to Garcia was that Mr. Barlean
came into the upstairs bathroom while
she was in there and "he pulls a gun
on me and tells me to get out. Then I
go into the bedroom." **(VIDEO FILE RAY
#1 @ 11:33)**.

H.   Mr. Barlean told the 911 operator that
he did not want to press charges on Ms.
Minor and just wanted her gone.

I.   Mr. Barlean is an officer of the Courts
of Oklahoma in good standing with
absolutely no history of criminal
violence.

J.   Ms. Minor was arrested and charged
with felony assault and battery with a
deadly weapon in Texas when she tried
to shoot her former boyfriend but pled
to a misdemeanor.  North Richland Hills

**COMPLAINT** Page **49** of **142**

1        Police Department 09/04/2001 Tracking

2        #00513773653.  **(EXHIBIT E**

3    K.  Ms. Minor retreated from the bathroom

4        to obtain a pistol.  She admitted to

5        Garcia that she had her cell phone with

6        her in the bedroom and that she could

7        have called the police before the

8        accidental discharge but chose not to

9        do so because she was in a hurry.

10       **(WILLIS REPORT PAGE 3)**.

11   L.  Ms. Minor bore an epic grudge against

12       Mr. Barlean because she was a jilted

13       lover, and he evicted her two days

14       earlier from his home for stealing from

15       him.

16   M.  Ms. Minor, after obtaining the pistol

17       from the bedroom, proceeded to hunt

18       down Mr. Barlean.  Not finding him in

19       the bathroom, she crossed through the

20       bathroom, found him in the hallway

21

**COMPLAINT** Page **50** of **142**

1          and made one her several admissions

2          that she pointed the pistol at Mr.

3          Barlean earlier that evening.

4     N.   Garcia asked her if Mr. Barlean "said

5          anything criminal like he's going to

6          shoot you or anything like that?" To

7          which Ms. Minor replied, "No, No."

8          **(VIDEO FILE RAY #1 @ 7:05)**.

9     O.   As Lee was transporting Ms. Minor to

10         OCDC, Willis documented in his report,

11         "Cynthia later told Officer Lee #2020

12         that she believed the safety on her

13         firearm was on because she attempted to

14         pull the trigger." **(WILLIS REPORT**

15         **PAGE 2)**.

16   105.    All the above-listed material facts

17   except the last (Ms. Minor's admission that she

18   pulled the trigger to shoot Mr. Barlean but the

19   safety was on was made to Lee as she was being

20   transported to OCDC – upon hearing this, any

21                  **COMPLAINT** Page **51** of **142**

1  potential arguable probable cause dissipated and Mr.

2  Barlean should have been immediately released from

3  custody before he was booked into OCDC).  Garcia

4  intentionally or recklessly omitted the above fact

5  from her Probable Cause Affidavit to justify Mr.

6  Barlean's warrantless arrest.  **(EXHIBIT K)**.

7      106.    Any layperson would know that each of

8  the above facts were material to making a probable

9  cause determination and that any reasonable judge

10 would want to know and see said facts in a Probable

11 Cause Affidavit before making a decision that would

12 profoundly and forever impact the life of a citizen

13 of the United States in the negative.

14     107.    Normally, probable cause may be

15 established by just a statement from a putative

16 victim absent special circumstances suggesting the

17 victim-witness is not credible.  Burden is upon Mr.

18 Barlean to show Ms. Minor's statements "Did not

19 constitute reasonably trustworthy information

20 sufficient to lead a prudent police officer to

21

1  conclude that Mr. Barlean committed an

2  offense." <u>Romero v. Fay</u>, 45 F.3d 1472 (10th Cir.

3  2007).

4      108.    In Mr. Barlean's Probable Cause

5  Affidavit, Garcia only used facts (some coached)

6  from Ms. Minor and the illegal search of Mr.

7  Barlean's home where she saw the bullet holes.  The

8  were no exculpatory paragraphs in his affidavit of

9  probable cause for a judge to weigh any competing

10  evidence to make a finding of probable cause.  It

11  was an affidavit for a rubber stamp.

12      109.    In Ms. Minor's Probable Cause

13  Affidavit, Garcia hastily used the one she wrote for

14  Mr. Barlean (that used only Ms. Minor's purported

15  facts} as the template adding only one paragraph of

16  a few sentences memorializing what Mr. Barlean told

17  Jacobsen about Ms. Minor putting a pistol to his

18  temple and that in the process of disarming her,

19  there was an accidental discharge.  In that

20  affidavit, a judge would weigh what Mr. Barlean

21

alleged and what Ms. Minor again alleged in both
Garcia affidavits that he pointed a black revolver
at her face, stating, "You're a worthless piece of
shit I'm going to kill you." **(EXHIBIT L)** versus
what she told Garcia the first time.

110.    When the police arrived, Ms. Minor was
not immediately placed in handcuffs and placed in
the back of a patrol vehicle like they did with Mr.
Barlean.

111.    Garcia found Mr. Barlean to be a
putative victim with no grudge against Ms. Minor and
concluded she had probable cause to make a
warrantless arrest of Ms. Minor based only upon Mr.
Barlean's credible statement.

112.    Garcia knew that Ms. Minor was a
jilted lover, evicted by Mr. Barlean, and that there
was a significant chance she bore a grudge against
him would have made it unreasonable - and therefore
unconstitutional - to arrest Mr. Barlean on Ms.
Minor's mere say-so.

1    113.    Garcia personally observed Ms. Minor's
2  lack of candor, signs of intoxication, and other
3  indicia of questionable reliability.  Garcia
4  incurred a constitutional duty to further
5  investigate.  Hebron v. Touhy, 18 F.3d 421, 423 (7th
6  Cir. 1994).

7    114.    In her Affidavit of Probable Cause,
8  Garcia omitted the material fact that would have
9  indisputably negated any arguable probable cause, if
10 any existed, and would have required the immediate
11 release of Mr. Barlean, Garcia did not inform the
12 magistrate that while Mr. Barlean was enroute to
13 OCDC, she learned that Ms. Minor admitted trying to
14 pull the trigger on Mr. Barlean's .45 pistol to
15 shoot him but the safety was on.  **(WILLIS REPORT**
16 **PAGE 3).**

17   115.    There were no legal grounds for the
18 Officer Defendants to warrantlessly arrest Mr.
19 Barlean. The police had an hour and a half to
20 procure an arrest warrant before Mr. Barlean
21

1 received his "Rough Ride" to OCDC on undisclosed

2 charges.  The Officer Defendants knew no competent

3 judge would authorize an arrest or search warrant

4 based only on the uncorroborated and unreliable

5 statement of an intoxicated, evicted, jilted lover

6 bearing a grudge.

7       116.     Mr. Barlean was handcuffed for two

8 hours before arriving at OCDC.  All the police

9 reports said Mr. Barlean was compliant and made no

10 references to being fearful of him or that he was

11 making threats of harm or presented a flight

12 risk.  Any reasonable officer would understand that

13 it is unconstitutional to handcuff someone absent

14 probable cause or an articulable basis to suspect a

15 threat to officer safety combined with reasonable

16 suspicion.

17      117.     Furthermore, all the Defendant Officers

18 are liable for violating Mr. Barlean's

19 constitutional rights because they were integral

20

21

1 | participants in the violation.  <u>Blankenhorn v. City</u>

2 | <u>of Orange</u>, 485 F.3d 463, 481 n. 12 (9th Cir. 2007).

3 |    118.    As a direct and proximate result of the

4 | unlawful seizure, arrest, and detention of Mr.

5 | Barlean, he was deprived of his civil rights as

6 | guaranteed to him by the Fourth Amendment of the

7 | U.S. Constitution, and suffered humiliation,

8 | degradation, apprehension for his bodily security,

9 | physical injuries, pain and suffering and other

10 | mental and emotional harms, which continue to this

11 | day and are likely to continue.

12 |    119.    WHEREFORE, Plaintiff demands judgment

13 | for compensatory and punitive damages against

14 | Defendant Officers, and in addition thereto, demands

15 | the award of attorney's fees (Plaintiff is aware

16 | that as a Pro Se attorney he is not entitled to an

17 | attorney fee but he may retain counsel during the

18 | course of this litigation) and court costs pursuant

19 | to 42 U.S.C. §§ 1983 and 1988 and demands a trial by

20 | jury on all issues so triable.

21 |

1

2

3

### COUNT THREE
### DEPRIVATION OF CIVIL RIGHTS
### BY EXCESSIVE FORCE/PROLONGED DETENTION
### UNDER 42 U.S.C. § 1983
*(Against Defendant Officers)*

120.    Plaintiff hereby realleges and
incorporates by reference the above allegations
contained in paragraphs 1 through 119 above.

121.    Mr. Barlean for ninety minutes was
handcuffed with his arms in back in the back of a
patrol car, lying face down on his driveway or
sitting on a curb in front of a neighbor's house the
with the whole time being told by the Officer
Defendants that he was not under arrest and that he
was only being detained.

122.    Jacobsen responded to one of Mr.
Barlean's protests by saying, "I know you used to
live in Colorado.  I've never lived in the state of
Colorado.  I don't know exactly what their forte is
with detainment and arrest..." before Mr. Barlean

1  cut him off, "It's federal law, has nothing to do
2  with the state law."

3     123.    Mr. Barlean spent his last half hour in
4  handcuffs getting a "Rough Ride" in the backseat of
5  a Solis' patrol car (hands cuffed behind back, and
6  seat belt was not used)  received injuries during
7  transport to OCDC experiencing back, face, knee and
8  shoulder pain along the way that was not rationally
9  related to any legitimate governmental objective and
10 that it was excessive in duration especially when
11 taking into account the facts that the police
12 concluded their investigation in under a half hour
13 of their arrival after only questioning Mr. Barlean
14 and Ms. Minor and that it only takes fifteen minutes
15 to drive from his house to OCDC.  Kingsley v.
16 Hendrickson, 576 U.S. 389, 396-397 (2015).

17    124.    No reasonable police officer in the
18 same circumstances could have concluded that Mr.
19 Barlean needed to be restrained at gunpoint, with
20 handcuffs and immediately secured in the back seat
21

1  of a patrol car after seeing through the glass storm

2  door that he was alone, unarmed, in gym clothes,

3  talking on the phone, and inviting him into his home

4  – or that he needed to remain in handcuffs for two

5  hours.

6      125.    The application of handcuffs on Mr.

7  Barlean was excessive, unnecessary force applied to

8  him under the totality of the circumstances that the

9  Defendant Officers faced and constituted a violation

10  of his established right to be free of excessive

11  force and right to bodily integrity under the Fourth

12  Amendment.   Mr. Barlean believes the only reason he

13  remained handcuffed for two hours was because he was

14  being physically punished by the Officer Defendants

15  for pointing out their professional shortcomings.

16  The Kingsley court held that pretrial detainees like

17  Mr. Barlean (unlike convicted prisoners) cannot be

18  punished at all, much less "maliciously and

19  sadistically." Id. At 401.

20

21

1    126.    Defendant Officers were authorized to
2  adopt a high arrival force posture due to the
3  severity of the alleged crime, but once they saw Mr.
4  Barlean through the locked glass door that he was
5  alone, unarmed and waving at them to come inside,
6  that there was a disproportionate relationship
7  between the need for the use of force and the amount
8  of force used.  Id. at 397.  Furthermore, the U.S.
9  Supreme Court in Florida v. Royer, 460 U.S. 491
10 (1983) held:

11          "An investigative detention must be
             temporary and last no longer than necessary
12          to effectuate the purpose of the stop.
             Similarly, the investigative methods
13          employed should be the least intrusive
             means reasonably available to verify or
14          dispel the officer's suspicion in a short
             period of time." Florida v. Royer, 460
15          U.S. 491, 511 (1983).

16 The most accessible and less-intrusive means of
17 investigation reasonably available to Defendant
18 Officers was to question Mr. Barlean upon arrival.
19    127.    The prolonged use of force in detaining
20 Mr. Barlean with handcuffs exacerbated his pre-
21

**COMPLAINT** Page **61** of **142**

1  existing back injuries and PTSD and caused him to
2  suffer pain and severe emotional injury. Officer
3  Defendants did not temper or limit the amount of
4  force they used, nor did Mr. Barlean present a
5  security problem or threat reasonably perceived by
6  the Officer Defendants as Mr. Barlean was not
7  actively resisting.  Id. at 397.

8      128.    Keeping Mr. Barlean in handcuffs for
9  two hours (with and hour a half after the
10 investigation concluded) is a governmental action
11 and is not rationally related to a legitimate
12 government purpose.  Id. at 398.

13     129.    The Officer Defendants punished Mr.
14 Barlean for pointing out everything they were doing
15 wrong and how they were going to cause the taxpayers
16 in Oklahoma City to finance his retirement.  Mr.
17 Barlean told Childers he looked forward to taking
18 his deposition and going through his personnel file.
19 Mr. Barlean could not have been clearer about what
20 was going to happen.

21

1    130.    Mr. Barlean's punishment continued
2   enroute to OCDC.  Officer Solis would not grant Mr.
3   Barlean's request to have the handcuffs removed or
4   to let him be handcuffed with his arms in front or
5   to have the seatbelt secure him for the "Rough Ride"
6   to OCDC.

7    131.    Defendant Officers, while acting under
8   color of law as authorized officers and agents of
9   the City of Oklahoma City, deprived Mr. Barlean of
10  his clearly established right to be free from
11  excessive force under the Fourth Amendment of the
12  U.S. Constitution, because they unreasonably used
13  excessive force to seize him using handcuffs and to
14  keep him seized in handcuffs for an unreasonable
15  period of two hours for no legitimate governmental
16  purpose.

17   132.    Mr. Barlean's injuries were the direct
18  and proximate result of the misconduct of Defendant
19  Officers as set out in this Complaint and associated
20  deliberate indifference to the rights of others and

21

is entitled to recover damages flowing from the
deprivations of his constitutional rights.

133.    As a direct and proximate cause of
Defendants' prolonged use of force that served no
legitimate investigative purpose, Mr. Barlean lost
his ability to control and manage the Post Traumatic
Stress Disorder he incurred in the military.  He
lost all his therapeutic gains from the psychic rage
of being in handcuffs and knowing that life as he
knew it was over and all that he achieved in life
and his chosen self-identity were being unjustly
taken away before his eyes.

134.    Before Mr. Barlean could regain his
mental management ability, he was charged with
violating 21 O.S. 644(J) - FELONY DOMESTIC ASSAULT &
BATTERY BY STRANGULATION (Case No. CF-2021-3557) to
which he pled guilty after the charge was reduced to
a misdemeanor.

135.    Several months later, Mr. Barlean was
charged and pled guilty to violating 21 O.S. 644 -

1  MISDEMEANOR DOMESTIC ASSAULT & BATTERY (Case No. CM-

2  2022-4468).

3     136.    As a condition of his plea agreements,

4  Mr. Barlean is currently enrolled in a Batterers

5  Intervention Program and has successfully completed

6  an Anger Management course.

7     137.    WHEREFORE, Plaintiff demands judgment

8  for compensatory and punitive damages against

9  Defendant Officers, and in addition thereto, demands

10  the award of attorney's fees and court costs

11  pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

12  trial by jury on all issues so triable.

13

14                    **COUNT FOUR**
                **DEPRIVATION OF CIVIL RIGHTS**
15    **BY RETALIATION AGAINST FREEDOM OF SPEECH**
                **UNDER 42 U.S.C. § 1983**
16              (*Against Defendant Officers*)

17     138.    Plaintiff hereby realleges and

18  incorporates by reference the above allegations

19  contained in paragraphs 1 through 137 above.

20

21
                **COMPLAINT** Page **65** of **142**

1     139.     Officer Defendants retaliated against

2 Mr. Barlean for exercising his First Amendment right

3 to educate them of their professional shortcomings

4 by arresting him without probable cause or warrant,

5 by searching his home without a warrant, consent, or

6 exigent circumstances and painfully prolonged his

7 detention in handcuffs for no investigatory reason

8 for an hour and a half in front of his home after

9 the investigation concluded.

10     140.     No further evidence was obtained from

11 any source regarding the events that evening.   The

12 only evidence the Defendant Officers had for their

13 collective knowledge came from either Mr. Barlean's

14 version of events that transpired or from the

15 several versions of events Ms. Minor proffered.

16     141.     The Officer Defendants had no

17 independent proof of any *corpus delicti*, or the

18 'body of the crime' and were hellbent on getting

19 inside Mr. Barlean's home.

20

21

**COMPLAINT** Page **66** of **142**

1      142.     Officer Defendants were agitated that
2   Mr. Barlean would not consent to a search of his
3   home.  After listening to Mr. Barlean critique their
4   performances for an hour, Solis informed him that
5   Childers was on his way.

6      143.     When Childers arrived, he asked Mr.
7   Barlean to tell him what happened that evening.  Mr.
8   Barlean refused and proceeded to tell Childers how
9   he almost got his officers killed because he failed
10  to properly train them on fundamental officer safety
11  procedures.

12     144.     When Mr. Barlean was seized, the
13  Officer defendants could see two loaded handguns on
14  a table by the door through the locked glass storm
15  door, yet they failed to secure the weapons and
16  conduct a protective sweep not knowing whether there
17  were any third parties in Mr. Barlean's home who
18  could have obtained the handguns and started a
19  shootout.

20

21

1     145.    Childers did not bring any new evidence

2 to sustain a warrantless arrest of Mr. Barlean.  Mr.

3 Barlean also chastised Childers for not teaching his

4 officers the fundamentals of constitutionally sound

5 seizure law and for not leading by example asking

6 Childers if he could even do a single pull-up.

7     146.    Childers then immediately conferred

8 with Lee, and they decided to search Mr. Barlean's

9 home without a warrant, and without exigent

10 circumstances present.  **(WILLIS REPORT PAGE 4)**.

11     147.    After the unreasonable warrantless

12 search of Mr. Barlean's home, Childers ordered that

13 Mr. Barlean be transported to OCDC for charges not

14 disclosed to Mr. Barlean.

15     148.    The First Amendment of the U.S.

16 Constitution protects a significant amount of verbal

17 criticism and challenge directed at police officers

18 including speech that is disputatious, emotionally

19 charged or profane. City of Houston, Tex. V. Hill,

20 482 U.S. 451, 461 (1987).

21

1    149.    Retaliation for the exercise of
2  constitutionally protected rights is itself a
3  violation of rights secured by the Constitution
4  actionable under §1983.  White v. Napoleon, 897 F.2d
5  103, 111-112 (3d Cir. 1990).  But for Mr. Barlean
6  exercising his protected Free Speech rights,
7  Childers would not have retaliated by punishing Mr.
8  Barlean.

9    150.    Childers' retaliatory actions were
10  sufficient to deter a person of ordinary firmness
11  from exercising his constitutional right to free
12  speech to criticize and question the conduct of
13  police should they ever show up and immediately put
14  that person in handcuffs with no explanation or even
15  asking them their name.  Furthermore, as previously
16  discussed above, no probable cause existed for any
17  of the three criminal offenses for which Mr. Barlean
18  was charged when booked into OCDC, and the complete
19  absence of any credible evidence in the Probable
20  Cause Affidavit that could establish the requisite
21

specific intent element for any of the crimes for which he was charged.

151.    Defendant Officers cannot show that the home search and Mr. Barlean's arrest would have been initiated without respect to retaliation. *See,* Nieves v. Bartlett, 139 S.Ct. 1715, 1725 (2019).  If Mr. Barlean had remained silent all evening, he would not have been transported to OCDC.  "So there can be little doubt that 'being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future.'"  Clary v. City of Cape Girardeau, 165 F.Supp.3d 808, 826 (E.D. Mo. 2016).

152.    The temporal proximity between the protected conduct and the retaliation may be probative of causation. *See,* Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003). However, the timing must be "unduly suggestive" of retaliatory motive to, by itself, support causality. See Id.; Lauren W. ex rel. Jean W. v. DeFlaminis,

1  480 F.3d 259, 267 (3d Cir. 2007) (causation may be
2  based on "an unusually suggestive temporal
3  proximity").  The warrantless search of Mr.
4  Barlean's home, his warrantless arrest and the
5  warrantless seizure of his firearms occurred within
6  minutes of Mr. Barlean asking Childers if he could
7  do even one pull-up.

8      153.   As a direct and proximate result of the
9  retaliatory home search, retaliatory arrest,
10 retaliatory confiscation of firearms and the
11 retaliatory prolonged detention of Mr. Barlean in
12 handcuffs after the dissipation of reasonable
13 suspicion and/or probable cause, Mr. Barlean was
14 deprived of his civil rights as guaranteed by the
15 First and Fourth Amendments of the U.S. Constitution
16 and suffered loss of liberty, loss of property,
17 humiliation, degradation, apprehension for his
18 bodily security, physical pain and suffering and
19 other mental and emotional harms, which continue to
20 this day and are likely to continue.

21

1    154.   WHEREFORE, Plaintiff demands judgment

2  for compensatory and punitive damages against

3  Defendant Officers, and in addition thereto, demands

4  the award of attorney's fees and court costs

5  pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

6  trial by jury on all issues so triable.

7

8                        **COUNT FIVE**
                 **DEPRIVATION OF CIVIL RIGHTS**
9        **BY CIVIL CONSPIRACY AT MR. BARLEAN'S HOME**
                 **UNDER 42 U.S.C. § 1983**
10   (*Against Willis, Childers, Garcia, Lee, Solis and
                         Doe*)

11    155.   Plaintiff hereby realleges and

12  incorporates by reference the allegations contained

13  in paragraphs 1 through 154 above.

14    156.   Lee and Childers hatched a plan to

15  frame Mr. Barlean for Assault with a Deadly Weapon

16  using only the false evidence given to them by a

17  highly intoxicated Ms. Minor to punish Mr. Barlean

18  for telling them they needed remedial training.

19    157.   Lee, Childers and Garcia, while acting

20  under color of law, entered into an agreement to

21
                **COMPLAINT** Page **72** of **142**

violate Mr. Barlean's well-established rights under the Fourth Amendment to be free from unreasonable searches and seizures.  Willis, Solis, Jacobsen and, unknown at this time, police officers John and/or Jane and Doe 1-12 met shortly thereafter with Childers and joined the conspiracy to punish Mr. Barlean by framing him with a felony and cause his prosecution.

158.   Specifically, Lee, Garcia and Childers conspired to continue punishing Mr. Barlean for his cutting-edge analyses of the Defendant Officers' performances.  The Officer Defendants had over an hour to procure search and arrest warrants, but they purposefully chose to not do so because they knew there was no way any competent magistrate would find probable cause that Mr. Barlean committed any crime based solely on Ms. Minor's unreliable statements.

159.   Lee, Childers and Garcia, in furtherance of the conspiracy, took the overt steps of violating Mr. Barlean's well established rights

1  to be free from arrest without probable cause, to be

2  free from having his home unreasonably searched and

3  to free from the unreasonable seizure of his

4  firearms when they entered Mr. Barlean's home

5  without a warrant, probable cause, consent, or the

6  presence of any exigent circumstances, seized his

7  firearms not used in the incident, and arrested Mr.

8  Barlean without a warrant or probable cause.

9      160.    Lee put in his report that they

10  decided, because of what they deemed a domestic

11  incident, ostensibly to protect Ms. Minor, to enter

12  and search Mr. Barlean's home for firearms and take

13  them to the police station for "safekeeping".

14      161.    During the search, Lee reported to

15  Childers that Mr. Barlean had a gun safe in his

16  garage and Childers told him, "You don't have to

17  worry about that."  **(VIDEO FILE RAY #3 @ 8:53)**.

18  This is proof of Childers's scienter to avoid going

19  to a judge for a warrant who would not find probable

20  cause existed to arrest Mr. Barlean or search his

21

1  home.  It is also proof that he was not genuinely
2  concerned about Ms. Minor's safety.  Childers did
3  not want to risk losing the opportunity to use the
4  ruse of "safekeeping" to go on a fishing expedition
5  in hope of finding evidence of criminal activity and
6  to impose a hardship on Mr. Barlean by making him go
7  through the hassle of getting his weapons back from
8  OCPD.

9      162.    Jacobsen and Solis also agreed to the
10 conspiracy and took the overt steps of helping load
11 the seized guns in the trunks of the patrol
12 vehicles.  Discovery will reveal if they also
13 unlawfully entered Mr. Barlean's home.

14     163.    The misconduct described in this count
15 was objectively unreasonable and was undertaken
16 intentionally, with malice, acted other than in the
17 normal course of their corporate duties, with
18 reckless indifference to the rights of others, and
19 in total disregard for the truth and Mr. Barlean's
20 clear innocence.

21

**COMPLAINT** Page **75** of **142**

1     164.    Mr. Barlean pleads a conspiracy count

2   in this matter to extend liability to all the

3   Defendant Officers acting in concert to violate his

4   rights even though they did not individually perform

5   all the acts charged in this complaint.  "A

6   conspiracy may be charged under section 1983 as the

7   legal mechanism through which to impose liability on

8   all of the defendants without regard to who

9   committed the particular act." Hale v. Townley, 45

10  F.3d 914, 920 (5th Cir. 1995).

11     165.    As a result of Defendant Officers'

12  misconduct described in this count, Mr. Barlean

13  suffered loss of liberty, loss of property, great

14  mental anguish, humiliation, degradation, emotional

15  pain and suffering, and other grievous and

16  continuing damages and injuries.

17     166.    WHEREFORE, Plaintiff demands judgment

18  for compensatory and punitive damages against

19  Defendant Officers, and in addition thereto, demands

20  the award of attorney's fees and court costs

21

**COMPLAINT** Page **76** of **142**

pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

### COUNT SIX
### DEPRIVATION OF CIVIL RIGHTS
### BY FAILURE TO INTERVENE
### UNDER 42 U.S.C. § 1983
*(Against Jacobsen, Solis and Does)*

167.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 166 above.

168.    During the constitutional violations described herein, including but not limited to Mr. Barlean's seizure without probable cause, prolonged detention in handcuffs without probable cause, search of home without a warrant and seizure of his firearms without a warrant, one or more of the Defendant Officers stood by without intervening to prevent the violation of Mr. Barlean's constitutional rights, even though they had the realistic opportunity to do so.

1    169.    The misconduct described in this count
2  was objectively unreasonable and was undertaken
3  intentionally, with malice, with reckless
4  indifference to the rights of others, and in total
5  disregard for the truth and Mr. Barlean's clear
6  innocence.

7    170.    The duty to intervene in this situation
8  would have been apparent to any objectively
9  reasonable law enforcement officer.  Hope v. Pelzer,
10 536 U.S. 730, 741 (2002).  The Tenth Circuit has
11 recognized "that all law enforcement officials have
12 an affirmative duty to intervene to protect the
13 constitutional rights of citizens from infringement
14 by other law enforcement officers in their
15 presence." Vondrak v. City of Las Cruces, 535 F.3d
16 1198, 1210 (10th Cir. 2008); See, Reid v. Wren, Nos.
17 94-7123, 94-7124, 57 F.3d 1081, 1995 WL 339401, at
18 *1-2 (10th Cir. 1995) (unpublished).

19   171.    As a result of the Officer Defendants
20 failure to intervene to prevent the violation of his

21

1   constitutional rights, Mr. Barlean suffered loss of

2   liberty, loss of property, physical injuries

3   resulting great pain and suffering, severe mental

4   anguish, humiliation, degradation, emotional pain

5   and suffering, and other grievous and continuing

6   damages and injuries.

7       172.    WHEREFORE, Plaintiff demands judgment

8   for compensatory and punitive damages against

9   Defendant Officers, and in addition thereto, demands

10  the award of attorney's fees and court costs

11  pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

12  trial by jury on all issues so triable.

13

14                  **COUNT SEVEN**
                **DEPRIVATION OF CIVIL RIGHTS**
15  **BY INVASION OF PRIVACY/UNREASONABLE WARRANTLESS**
                **SEARCH OF MR. BARLEAN'S HOME**
16               **UNDER 42 U.S.C. § 1983**
                (*Against Officer Defendants*)

17      173.    Plaintiff hereby realleges and

18  incorporates by reference the allegations contained

19  in paragraphs 1 through 172 above.

20

21
                **COMPLAINT** Page **79** of **142**

1    174.    Defendant Officers, while acting

2  individually, jointly and in conspiracy with one

3  another, as well as under color of law and within

4  the scope of their employment, violated Mr.

5  Barlean's well-settled right to privacy under the

6  Fourth Amendment which has been declared enforceable

7  against the States through the Due Process Clause of

8  the Fourteenth Amendment.  Mapp v. Ohio, 367 U.S.

9  643, 655 (1961). "The security of one's privacy

10  against arbitrary intrusion by the police — which is

11  at the core of the Fourth Amendment — is basic to a

12  free society." Wolf v. Colorado, 338 U.S. 25, 27

13  (1949).

14    175.    The Officer Defendants did not have:  a

15  warrant to search Mr. Barlean's home, Mr. Barlean's

16  consent to a search nor were there any exigent

17  circumstances to allow a warrantless search.  They

18  had over an hour and a half to procure a search

19  warrant before Mr. Barlean was transported to OCDC.

20

21

1    176.    Because Defendant Officers were not

2  lawfully in Mr. Barlean's home, they were legally

3  estopped from making any video recordings or still

4  photographs to memorialize what they saw during the

5  execution of their search or what they wrongfully

6  considered a crime scene.  Furthermore, Garcia's BWC

7  also shows her outrageously using her own cell phone

8  camera.  **(VIDEO FILE RAY #3 @ 2:53)**.

9    177.    Defendant Officers' video recordings

10  constituted a search under the Fourteenth Amendment

11  because they were unlawfully inside Mr. Barlean's

12  home.  There will be additional, future

13  searches/invasions of his privacy whenever the BWC

14  footage, a public record, is released pursuant to

15  the Open Records Act revealing, to all requestors, a

16  highly detailed profile of his military service,

17  political associations, religious views and romantic

18  life. *See*, Commonwealth v. Yousuf, 488 Mass. 379

19  (Mass. 2021); Berger v. New York, 388 U.S. 41, 53

20  (1967) ("'[t]he basic purpose of [the Fourth]

21

1  Amendment… is to safeguard the privacy and security

2  of individuals against arbitrary invasions by

3  governmental officials'" (quoting <u>Camara v. Mun. Ct.</u>

4  <u>of City & Cnty. of S.F.</u>, 387 U.S. 523, 528 (1967))).

5      178.    The misconduct described in this count

6  was objectively unreasonable and was undertaken

7  intentionally, with malice, with reckless

8  indifference to the rights of others, and in total

9  disregard for the truth and Mr. Barlean's clear

10  innocence.

11      179.    Malice may be inferred from the

12  Defendant Officers' willful disregard of OCPD

13  Operations Manual § 188.0 **Body Worn Cameras**.

14  Specifically, the first two subsections of § 188.32

15  state that an officer shall not activate or shall

16  deactivate their body-worn camera:

17          1.  When knowingly interviewing victims,
               witnesses, involved parties or
18             reporting parties;

19          2.  In any situation where individuals have
               a reasonable expectation of privacy,
20             such as their residence, a bathroom or
               locker room;
21

**COMPLAINT** Page **82** of **142**

180.    As a result of Defendant Officers' misconduct, Mr. Barlean suffered loss of liberty, loss of property, great mental anguish, humiliation, degradation, emotional and physical pain and suffering, and other grievous and continuing damages and injuries.

181.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

### COUNT EIGHT
### DEPRIVATION OF CIVIL RIGHTS
### BY UNREASONABLY SEIZING MR. BARLEAN'S FIREARMS
### UNDER 42 U.S.C. § 1983
*(Against Officer Defendants)*

182.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 181 above.

1    183.    By confiscating Mr. Barlean's guns not

2   involved in the incident without legal authority,

3   Defendant Officers knowingly violated 22 OK Stat §

4   22-60.8A (2021):

5           A. Each peace officer of this state shall
            seize any weapon or instrument when such
6           officer has probable cause to believe such
            weapon or instrument has been used to
7           commit an act of domestic abuse as defined
            by Section 60.1 of this title, provided an
8           arrest is made, if possible, at the same
            time.
9
10          184.    Defendant Officers also intentionally

11  violated the Oklahoma City Police Department

12  Operations Manual, Fifth Edition, § *254.30 Securing*

13  *Weapons* (Revised September 2020):

14          "Officers may take temporary custody of any
            weapon or instrument at the scene of a
            domestic violence incident for safety
15          reasons. If the weapon was not involved in
            any apparent criminal offense, and once the
16          crime scene is secured and there is no
            immediate danger to any individual
17          involving a threat to human life or
            physical assault, any temporarily seized
18          weapon or instrument shall be returned to
            the owner or remain at the scene."
19
20          185.    Mr. Barlean had a well-established

21  constitutional right to not have his firearms

**COMPLAINT** Page **84** of **142**

1  unreasonably seized under the Fourth Amendment.  The
2  U.S. Supreme Court in Caniglia v. Strom, 141 S. Ct.
3  1596 (2021), held that guns may not be taken from a
4  home without a warrant for safekeeping under the
5  community caretaking doctrine which was originally
6  designed for searches of vehicles already under
7  police control.  The Officer Defendants used
8  "safekeeping" as a pretext to punish Mr. Barlean by
9  confiscating his firearms and forcing him to go
10 through the administrative hassle to get them
11 returned from the OCPD Property Room.

12     186.    The misconduct described in this count
13 was objectively unreasonable and was undertaken
14 intentionally, with malice, with reckless
15 indifference to the rights of others, served no
16 investigatory purpose and without probable cause or
17 statutory authority.

18     187.    As a result of Defendant Officers'
19 unlawful seizure of his guns, Mr. Barlean suffered
20 loss of liberty, loss of property, great mental

21

anguish, humiliation, degradation, emotional and physical pain and suffering, and other grievous and continuing damages and injuries.

188.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

### COUNT NINE
### DEPRIVATION OF CIVIL RIGHTS
### BY VIOLATING MR. BARLEAN'S SECOND AMENDMENT
### RIGHT TO POSSESS A HANDGUN IN HIS HOME
### UNDER 42 U.S.C. § 1983
*(Against All Officer Defendants)*

189.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 188 above.

190.    The false arrest of Mr. Barlean by Officer Defendants was the direct and proximate cause of the loss of his well-established right to self-defense by having a handgun in his home.

1      191.    Mr. Barlean had a valid concealed

2  handgun license issued by the Oklahoma State Bureau

3  of Investigation.  He is a senior citizen and a 100%

4  disabled veteran who procured a license to protect

5  himself and loved ones.

6      192.    The U.S. Supreme Court in <u>District of</u>

7  <u>Columbia v. Heller</u>, 554 U.S. 570, 589 (2008) clearly

8  established that the Second Amendment allows a

9  person to keep a handgun in one's home and that it

10  applies to the states through the Fourteenth

11  Amendment.

12      193.    21 OK Stat § 21-1290.17 (2021) required

13  the Oklahoma State Bureau of Investigation to

14  immediately suspend Mr. Barlean's handgun license

15  for concealed carry.  "Any provision of law that

16  requires a revocation of a handgun license upon a

17  conviction shall cause the Bureau to suspend the

18  handgun license upon the discovery of the arrest of

19  the person for such offense…".

20

21

**COMPLAINT** Page **87** of **142**

1    194.    After eight days, on June 15, 2021, Mr.
2  Barlean was released from jail because the DA
3  declined to file any charges.

4    195.    When Mr. Barlean was released, he
5  called the Oklahoma State Bureau of Investigation
6  ("OSBI"} to check the status of his handgun license
7  and discovered it was suspended.

8    196.    Mr. Barlean was unable to exercise his
9  Second Amendment right to self-defense for a month
10 and a half until he was able to obtain a letter from
11 the District Attorney, under raised seal, stating
12 the DA declined to file any charges against Mr.
13 Barlean and gave it to OSBI so they could lift the
14 handgun license suspension.

15    197.    Mr. Barlean is a Recreational Vehicle
16 enthusiast. He had plans to take some friends for a
17 road trip staying at various RV parks/campgrounds.
18 To protect his family, friends and himself, Mr.
19 Barlean possesses a concealed handgun license from
20 OSBI to be able to legally drive across state lines
21

1  while carrying a concealed .45 in a shoulder holster
2  to defend against a carjacking or robbery.

3      198.    Mr. Barlean only drives though and
4  stays in states that honor his Oklahoma gun
5  permit.  Once at a campground, he hooks up the
6  utilities to the RV and employs a jack and blocks to
7  level the now immobile motor home.  Mr. Barlean
8  carries a concealed .45 pistol when in and outside
9  of the RV at an RV park to guard against a home
10 invasion.

11     199.    Mr. Barlean was forced to cancel his
12 vacation plans after learning OSBI suspended his
13 concealed carry handgun license.  Mr. Barlean had no
14 choice because he did not want to risk committing a
15 felony in a sister state by violating their
16 concealed carry laws.

17     200.    Defendant Officers stripped Mr. Barlean
18 of his right under the Second Amendment to protect
19 himself and his travelling companions while
20 traveling out of state.  The Officer Defendants'
21

1  false arrest of Mr. Barlean was the proximate cause
2  of OSBI suspending his handgun license and losing
3  his constitutional right under Heller to possess a
4  handgun in his motorhome while it is immobile at a
5  RV park in a sister state.

6      201.   As a direct and proximate result of
7  Plaintiff's false arrest, Mr. Barlean was deprived
8  of his rights guaranteed by the Second and
9  Fourteenth Amendments of the U.S. Constitution and
10 suffered humiliation, degradation, apprehension for
11 his bodily security, other mental and emotional
12 harms, and hedonic damages.

13     202.   WHEREFORE, Plaintiff demands judgment
14 for compensatory and punitive damages against
15 Defendant Officers, and in addition thereto, demands
16 the award of attorney's fees and court costs
17 pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a
18 trial by jury on all issues so triable.
19
20
21

1

2

3

## COUNT TEN
## DEPRIVATION OF CIVIL RIGHTS
## BY MALICIOUS PROSECUTION
## UNDER 42 U.S.C. § 1983
(*Against Defendant Officers*)

4

5

6

203.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 202 above.

7

8

9

10

11

12

13

14

204.    Defendant Officers, individually, jointly, an in conspiracy with one another, as well as under color of law and within their scope of employment, deprived Mr. Barlean of his well-established constitutional right to be free of unreasonable seizures of the person and malicious prosecutions recognized by the Tenth Circuit in Bledsoe v. Carreno, 53 F.4th 589 (10th Cir. 2022).

15

16

17

18

19

20

205.    Defendant Officers falsely accused Mr. Barlean of committing a serious felony offense and exerted their influence to cause his continued confinement in OCDC until his video probable cause hearing and thereafter without any probable cause for doing so, in violation of Mr. Barlean's rights

21

1  guaranteed under the Fourth Amendment and the
2  procedural and substantive due process components of
3  the Fourteenth Amendment.

4      206.    Defendant Officers arrested Mr. Barlean
5  without probable cause because he hurt Childers'
6  feelings.  Defendant Officers caused Mr. Barlean to
7  be confined in OCDC for two days before he received
8  a probable cause hearing.  These judicial
9  proceedings were instituted and continued
10 maliciously, resulting in injury, and all such
11 proceedings were ultimately terminated in Mr.
12 Barlean's favor with no charges being filed against
13 him by the District Attorney.  Thompson v. Clark,
14 142 S. Ct. 1332, 1341 (2022).

15     207.    Mr. Barlean was incarcerated eight days
16 after a Judge found probable cause existed after
17 reading Garcia's inadequate Probable Cause Affidavit
18 that contained false facts and omissions of material
19 facts designed to hoodwink a judge into making a
20 finding of probable cause.

21

**COMPLAINT** Page **92** of **142**

1      208.    Lead investigator Willis generated an

2  Incident Report designed to get the DA to prosecute

3  Mr. Barlean.  The report contained a synopsis of the

4  reports of the other police officers, a criminal

5  history of the parties and supposedly all the BWC

6  footage from all the officers responding to Mr.

7  Barlean's home.

8      209.    Willis' scienter of maliciously framing

9  Mr. Barlean is evidenced by his purposefully

10 omitting from the report the synopsis of Jacobsen's

11 BWC footage showing him telling Mr. Barlean that Ms.

12 Minor's stories were not adding up, they don't make

13 sense and his belief that nobody would be going to

14 jail.

15     210.    Willis intentionally or recklessly

16 omitted from his report Ms. Minor's previous assault

17 conviction for trying to shoot her boyfriend and

18 that she was driving on a suspended driver's

19 license.

20

21

**COMPLAINT** Page **93** of **142**

1    211.    The misconduct in this Count was
2  objectively unreasonable and was undertaken
3  intentionally, with malice, with reckless
4  indifference to the rights of others, and in total
5  disregard of the truth and Mr. Barlean's clear
6  innocence.

7    212.    Mr. Barlean lacks a meaningful state
8  law remedy to fully redress his federal
9  constitutional injures caused the Officer
10 Defendants' misconduct described in this Count.

11    213.    As a result of the misconduct of the
12 Defendant Officers, described in this Count, Mr.
13 Barlean suffered loss of liberty, loss of property,
14 physical pain and suffering, great mental anguish,
15 humiliation, degradation, emotional pain and
16 suffering, and other grievous and continuing
17 injuries and damages.

18    214.    WHEREFORE, Plaintiff demands judgment
19 for compensatory and punitive damages against
20 Defendant Officers, and in addition thereto, demands
21

1 | the award of attorney's fees and court costs
2 | pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a
3 | trial by jury on all issues so triable.

4

5 | **COUNT ELEVEN**
**DEPRIVATION OF CIVIL RIGHTS**
6 | **BY DEPRIVING MR. BARLEAN'S LIBERTY INTEREST IN HIS**
**GOOD NAME AND REPUTATION/RIGHT TO**
7 | **CANDIDACY/DEFAMATION BY IMPLICATION AND STIGMA-PLUS**
**UNDER 42 U.S.C. § 1983**
8 | (*Against Willis*)

9 | 215.    Plaintiff hereby realleges and
10 | incorporates by reference the allegations contained
11 | in paragraphs 1 through 214 above.

12 | 216.    Defendant Officers, while acting
13 | individually, jointly and in conspiracy with one
14 | another, as well as under color of law and within
15 | the scope of their employment, deprived Mr. Barlean
16 | of his protected liberty interest in his good name
17 | and reputation under the Due Process Clause of the
18 | Fourteenth Amendment and his right under the First
19 | Amendment by implying that Mr. Barlean was convicted
20 | of the moral turpitude crimes of burglary and

21

**COMPLAINT** Page **95** of **142**

1 | embezzlement in a published police report that is
2 | now a public record.

3 |     217.    Willis, an experienced investigator,
4 | must have discovered that Mr. Barlean was a former
5 | politician in the state of Washington and that he
6 | was just getting established in local GOP circles
7 | running as a candidate for the Oklahoma State House
8 | of Representatives several months earlier in
9 | November 2020.  Mr. Barlean was the Republican
10 | Party's nominee running in Oklahoma's legislative
11 | district most hostile to Republicans.  Mr. Barlean
12 | significantly outperformed President Donald Trump in
13 | every precinct where they were both on the same
14 | ballot.  The poll voters in House District 88, gave
15 | President Trump 2,684 votes and, despite the normal
16 | down-ballot drop-off in voter participation, gave
17 | Mr. Barlean 2,993 votes.

18 |     218.    Willis knew or must have known that a
19 | layperson doing basic campaign opposition research
20 | on Mr. Barlean, would utilize the state's Open
21 |

1  Records Act and see the section of Willis' report

2  titled "CRIMINAL HISTORY" and would quickly see and

3  infer that Mr. Barlean cannot be entrusted with the

4  taxpayer's money due to Willis imputing that Mr.

5  Barlean committed the moral turpitude crimes of

6  burglary and embezzlement which, for all intents and

7  purposes extinguished Mr. Barlean's political

8  career.

9      219.    Willis made an incident report designed

10 to get the District Attorney to prosecute Mr.

11 Barlean.  His report branded Mr. Barlean an

12 embezzler, which effectively stripped him of his

13 right under the First Amendment to be a candidate

14 for public office ever again.  In politics,

15 perception is reality.  Being labeled an embezzler

16 in Oklahoma is a stigma than can never be removed in

17 party politics (especially for Republicans).

18 Oklahoma law keeps embezzlers off the ballot for

19 fifteen years.  26 OK Stat § 26-5-105a (2021) reads:

20          A.  A person who has been convicted of a
               misdemeanor involving embezzlement or a
21

felony under the laws of this state or
of the United States or who has entered
a plea of guilty or nolo contendere to
such misdemeanor involving embezzlement
or felony or who has been convicted of
a crime in another state which would
have been a misdemeanor involving
embezzlement or a felony under the laws
of this state or has entered a plea of
guilty or nolo contendere to such crime
shall not be eligible to be a candidate
for or to be elected to any state,
county, municipal, judicial or school
office or any other elective office of
any political subdivision of this state
for a period of fifteen (15) years
following completion of his sentence or
during the pendency of an appeal of
such conviction or plea.

220.    Willis' report implies that Mr. Barlean is an enemy of the taxpayer, an embezzler, which will permanently prevent him from: (1) ever winning a Republican Party primary election in Oklahoma or any other state, (2) ever again having the title of the "Republican Nominee", and (3) the loss of future earnings as from political and business endeavors. "Only where the stigmatization results in the inability to obtain other employment does [a liberty-interest] claim rise to a constitutional

level.")," Martin Marietta Materials, Inc. v. Kan.
Dep't of Transp., 810 F.3d 1161, 1186 (10th Cir.
2016).  Thus, Willis has forced Mr. Barlean to
abandon his liberty interest in self-identifying as
a law-and-order Republican and become a Social
Justice Warrior if he wants to continue his
political career.

221.    The Tenth Circuit Court of Appeals
held, "[f]or a plaintiff to prevail on a claim that
the government has violated the Due Process Clause
by damaging [his] reputation, that plaintiff must
satisfy the 'stigma-plus' standard. That standard
requires the plaintiff to demonstrate both (1)
governmental defamation and (2) an alteration in
legal status." Martin Marietta Materials, Inc. v.
Kan. Dep't of Transp., 810 F.3d 1161, 1184 (10th
Cir. 2016)

222.    Defendant Officers subjected Mr.
Barlean to arbitrary governmental action that
shocked the conscience.  Because Mr. Barlean hurt

1   Childers' feelings, Childers punished Mr. Barlean by

2   trampling on the U.S. Constitution by ordering the

3   illegal search of Mr. Barlean's home, his illegal

4   arrest, the illegal confiscation of his firearms,

5   and his "Rough Ride" to OCDC.

6       223.    Any reasonable person would read the

7   Criminal History section of Willis' report and

8   reasonably infer that Mr. Barlean was a "convicted

9   burglar" and a "convicted embezzler" and would not

10  want that person controlling the public's finances.

11      224.    Willis' submitted a defamatory police

12  report that he knew was going to be a public record.

13  His report is an unprivileged executive

14  communication – only judicial and legislative

15  reports are fully privileged.  His report is now a

16  public record that brands Mr. Barlean with the

17  stigmas of being a thief and an inaccurate wife

18  shooter into eternity.

19      225.    Willis and his coconspirators were

20  maliciously punishing Mr. Barlean.  They knew that

21

1 Mr. Barlean was innocent, Mrs. Minor was not a
2 credible witness, filed incident reports written in
3 a manner to ensure Mr. Barlean stayed incarcerated
4 for a long time.  "Actual malice may be found when a
5 publisher had a "subjective awareness of probable
6 falsity." Gertz v. Robert Welch, Inc. 418 U.S. 323
7 at 334 n.6 (1974), Talley v. Time, Inc., 923 F.3d
8 878, 896 (10th Cir. 2019).

9    226.    Defendant Officers, while acting under
10 color of law, intentionally and/or recklessly
11 abridged Mr. Barlean's well-established First
12 Amendment rights of association, individual
13 expression, self-determination, right to be a
14 candidate and right to participate effectively in
15 the electoral process, specifically, by taking away
16 his right to vote for himself.  "Consequently, we
17 hold that candidacy is both a protected First
18 Amendment right and a fundamental interest." Mancuso
19 v. Taft, 476 F.2d 187, 196 (1st Cir. 1973).
20
21

1      227.    As a result of the misconduct of

2 Defendant Officers described in this Count, their

3 actions constituted libel *per se* and defamation by

4 implication and stigma-plus causing Mr. Barlean to

5 suffer loss of liberty, property, business and

6 political opportunities, and great mental anguish,

7 humiliation, degradation, emotional and physical

8 pain and suffering, and other grievous and

9 continuing injuries and damages.  Mr. Barlean lost

10 his right, and the privilege, to serve the voters

11 again in public office, and lost his right to vote

12 for himself.

13      228.    WHEREFORE, Plaintiff demands judgment

14 for compensatory and punitive damages against

15 Officer Defendants, and in addition thereto, demands

16 the award of attorney's fees and court costs

17 pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

18 trial by jury on all issues so triable.

19

20

21

**COMPLAINT** Page **102** of **142**

## COUNT TWELVE
### DEPRIVATION OF CIVIL RIGHTS
### BY CIVIL CONSPIRACY AT JAIL
### UNDER 42 U.S.C. § 1983

(*Against Solis, Childers, Roe, Pettit and Does 1-12*)

229.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 228 above.

230.    When Mr. Barlean was being booked into OCDC, he could not remove his USAFA ring because his hands, wrists and fingers were grotesquely swollen after being handcuffed behind his back for two hours.  Mr. Barlean asked Roe for some soap to help remove the ring.  He then observed Solis lean over and whisper in Roe's ear.  Solis then left the room and returned a couple of minutes later holding his cell phone and again whispered into Roe's ear.  Roe then told Mr. Barlean to leave it on and ordered him to walk through the metal detector (which sounded an alarm) and enter the OCDC secure area.

231.    Mr. Barlean believes that Solis called Childers and they formed a conspiracy to keep

1   punishing Mr. Barlean as a pretrial detainee in OCDC

2   and, in furtherance of it, solicited Roe to join the

3   conspiracy to give the best OCDC experience possible

4   to Mr. Barlean.

5       232.    Roe joined the conspiracy, and in

6   furtherance of it, ordered Mr. Barlean to wear his

7   USAFA ring into the jail.  This affirmative act of

8   Roe had no legitimate governmental purpose and the

9   Court may infer that his conduct was malicious and

10  conscience shocking because, as an experienced

11  booking officer, he intentionally violated 57 OK

12  Stat § 57-21 (2021) by forcing Mr. Barlean to bring

13  contraband gold jewelry into OCDC – a felony

14  offense.

15      233.    Pettit, in furtherance of conspiracy,

16  made false entries on the intake exam forms that the

17  Classification Officer uses, in part, to determine

18  where inmates are housed and what security level is

19  appropriate for them.  Pettit falsely documented:

20

21

1    A.   Have you ever committed a violent offense?
2         **YES**.
3    B.   Is the inmate's criminal history
4         exclusively non-violent? **NO**.
5    C.   Have you ever been hospitalized for
6         depression or mental health problems in the
7         past 7 years?  **YES (VA "a couple days")**.
8    D.   Does the patient were glasses, contacts,
9         dentures, partial, hearing aids or use
10        canes, crutches or any prosthesis or
11        medical devices?  **NO**.
12   E.   Disposition/Plan of Action – **Stable MH**
13        **Condition GENERAL POPULATION** (**EXHIBIT M)**.

14   234.    John Doe #1 is the Classification
15  Officer who joined the conspiracy to continue
16  punishing Mr. Barlean and aided in its execution by
17  classifying Mr. Barlean as an unaffiliated gang
18  member and ordered him housed in the Maximum-
19  Security gang Pod.
20
21
              **COMPLAINT** Page **105** of **142**

1    235.    Several weeks later, when Mr. Barlean

2  was arrested on a different matter and was booked

3  into OCDC on August 18, 2021, that Classification

4  Officer sent Mr. Barlean to the Medical Floor based

5  on that intake nurse's notation on her

6  Classification Communication/Relocation Form –

7  **Special needs – MEDICAL HOUSING – CPAP WHILE**

8  **SLEEPING.   (EXHIBIT N).**

9    236.    John Doe #2 joined the conspiracy to

10  continue punishing Mr. Barlean and, in furtherance,

11  told the other inmates that Mr. Barlean was a

12  Prosecutor and was paid to put people in jail.

13    237.    Mr. Barlean believes more guards and/or

14  medical staff were participants in the conspiracy to

15  deprive him of his well-established right as a

16  pretrial detainee to be free of any punishment and

17  unsafe living conditions.

18    238.    Mr. Barlean was continuously exposed to

19  extreme, imminent danger from the other inmates

20  threatening to harm him for being a former

21

1  prosecutor and/or seeking to relieve him of his

2  USAFA ring.

3    239.    The misconduct by all Defendants

4  described in this count was objectively unreasonable

5  and was undertaken intentionally, with malice, acted

6  other than in the normal course of their corporate

7  duties, with reckless indifference to the rights of

8  others, and in total disregard for the truth and Mr.

9  Barlean's clear innocence.

10    240.    Mr. Barlean pleads a conspiracy count

11  to extend liability to all Defendants acting in

12  concert to violate Mr. Barlean's rights even though

13  they did not individually perform all the acts

14  charged in this complaint.  "A conspiracy may be

15  charged under section 1983 as the legal mechanism

16  through which to impose liability on all of the

17  defendants without regard to who committed the

18  particular act." Hale v. Townley, 45 F.3d 914,

19  920 (5th Cir. 1995).

20

21

1    241.    As a result of the misconduct of Solis,

2  Roe, Pettit, Childers, Doe #1 and Doe #2 described

3  in this count, Mr. Barlean suffered loss of his

4  liberty interest in bodily integrity, cuts, scrapes,

5  lacerations and deep bruising of his arms, elbows,

6  feet, fingers, hands, knees, shins, great physical

7  pain, severe mental anguish, emotional pain and

8  suffering, and other grievous and continuing damages

9  and injuries.

10    242.    WHEREFORE, Plaintiff demands judgment

11  for compensatory and punitive damages against Solis,

12  Pettit Roe, Childers, Doe #1, and Doe #2, in

13  addition thereto, demands the award of attorney's

14  fees and court costs pursuant to 42 U.S.C. §§ 1983

15  and 1988 and demands a trial by jury on all issues

16  so triable.

17
          **COUNT THIRTEEN**
          **DEPRIVATION OF CIVIL RIGHTS**
18        **BY DELIBERATE INDIFFERENCE**
          **UNDER 42 U.S.C. § 1983**
19        *(Against Turn Key, Brock, Winchester, and Jail*
20                        *Trust)*

21

1

2      243.    Plaintiff hereby realleges and

3  incorporates by reference the allegations contained

   in paragraphs 1 through 242 above.
4
       244.    Mr. Barlean has constitutional
5
   protection against deliberate indifference to a
6
   pretrial detainee's serious medical condition that
7
   springs from the Fourteenth Amendment's Due Process
8
   Clause.
9
       245.    Mr. Barlean was a pretrial detainee
10
   entitled to the same degree of protection regarding
11
   medical attention as that afforded convicted inmates
12
   under the Eighth Amendment via the Fourteenth
13
   Amendment.  The right to custodial medical care for
14
   pretrial detainees like Mr. Barlean is well-settled
15
   and that deliberate indifference to serious medical
16
   needs of prisoners constitutes the "unnecessary and
17
   wanton infliction of pain."  Estelle v. Gamble, 429
18
   U.S. 97, 104 (1976).
19

20

21
                   **COMPLAINT** Page **109** of **142**

246.    Mr. Barlean had a sleep study conducted in 1999 and was diagnosed with severe obstructive sleep apnea, prescribed a Continuous Positive Airway Pressure machine ("CPAP") to avoid having a stroke and has used a CPAP every night of his life until he was incarcerated at OCDC. **(EXHIBIT V)**.

247.    On June 8, 2021, around 9 p.m., Mr. Barlean woke up gasping for breath and spasming in his bed. He believed he was starting to have a stroke as he was hyperventilating, experiencing tunnel vision, loud ringing in his ears and experiencing severe fatigue and pain at the same time.  Mr. Barlean called for medical assistance and was taken to the infirmary.

248.    Mr. Barlean explained his symptoms and fear of death from lack of a CPAP to Nurse Butch Brock.  Mr. Barlean told Brock that his former spouse tried to drop off his CPAP, but the jail would not accept it without a copy of the prescription.  Mr. Barlean told him that he did not

1  have a copy of the prescription and asked the

2  infirmary to temporarily issue him a CPAP. Brock

3  told Mr. Barlean that they did not issue CPAPs.

4  Brock then made an appointment for Mr. Barlean to

5  see Medical Director Winchester scheduling the

6  appointment as "Priority 1 High" to see if anything

7  could be done.

8      249.    Courts have long held that a prison

9  official's deliberate indifference to an inmate's

10  serious medical needs constitutes cruel and unusual

11  punishment in violation of the Eighth Amendment.

12  *See* Id. Winchester had actual notice of Mr.

13  Barlean's dire, immediate need for a CPAP after

14  speaking with and examining Mr. Barlean.  Any

15  reasonable physician could tell by Mr. Barlean's

16  shaking, very high blood pressure readings and

17  extreme fatigue that Mr. Barlean was on the verge of

18  a stroke and would immediately procure a CPAP to a

19  patient exhibiting that symptomology.  Farmer v.

20  Brennan, 511 U.S. 825, 847 (1994).   Winchester

21

1  documented in his chart note all the above.

2  **(EXHIBIT O).**

3      250.    The chart notes of Turn Key's nurses

4  reflect that Mr. Barlean had unacceptably high blood

5  pressure readings every time he was checked during

6  his incarceration.

7      251.    Winchester denied Mr. Barlean's plea

8  for a CPAP, telling him that Turn Key did not

9  provide CPAPs due to budgetary constraints.

10     252.    Winchester observed Mr. Barlean and

11 documented on his Subjective Interview Form that he

12 appeared "shakey [sic] and weak", Mr. Barlean was

13 very alert and oriented, understood the gravity of

14 his medical condition and was able to discuss it

15 with him.  The Tenth Circuit Court of Appeals in

16 Self v. Crum, 439 F.3d 1127, 1232 (10th Cir. 2006)

17 held "that a deliberate indifference claim will

18 arise when a medical professional completely denies

19 care although presented with recognizable symptoms

20 which potentially create a medical emergency."

21

1    253.    Despite seeing firsthand Mr. Barlean's

2   physical appearance, reading the chart notes of the

3   multiple instances of dangerously high blood

4   pressure, being told by Mr. Barlean that he had been

5   in continuous use of a CPAP since 1999, having the

6   professional knowledge and experience to know that

7   severe Obstructive Sleep Apnea is a life-threatening

8   condition, Medical Director Winchester, as

9   physician, policymaker and gatekeeper to medical

10  equipment, unconstitutionally refused Mr. Barlean's

11  request to be issued a CPAP resulting in unnecessary

12  and wanton infliction of pain, suffering, and

13  unacceptably heightening his risk of having a

14  stroke.

15    254.    Winchester's denial of providing a CPAP

16  to Mr. Barlean was a fiscal policy choice to benefit

17  his employer's shareholders and possibly himself if

18  he is also a shareholder of Turn Key.  Said denial

19  interrupted the continuous care by medical

20  professionals since 1999 treating Mr. Barlean's life

21

1  threatening obstructive sleep apnea without any

2  medical consideration.  The denial to provide Mr.

3  Barlean with a CPAP constitutes reckless conduct by

4  Winchester and Turn Key for intentionally stopping

5  prescribed treatment.  Estelle, 429 U.S. at 104-105

6  (1976).

7      255.    Despite knowing how much Mr. Barlean

8  was suffering mentally and physically from not

9  having a CPAP, Winchester was going to make Mr.

10 Barlean wait another week before he would contact

11 the VA hospital to get a CPAP prescription from them

12 so Mr. Barlean's former spouse could drop it off

13 later as he noted in his Subjective Interview Form

14 of June 14, 2021.  Winchester could have written the

15 prescription himself right then and Mr. Barlean's

16 suffering would have ended that day.

17     256.    Turn Key's policy of not providing

18 CPAPs to inmates with Severe Obstructive Sleep Apnea

19 is cruel and unusual punishment in violation of the

20 Eighth Amendment and basing medical decisions and

21

1  policies on shareholder profits at the expense of

2  the inmates' constitutional right to medical care is

3  shameful and shocking.  Turn Key is liable to Mr.

4  Barlean for having an unconstitutional policy of not

5  providing CPAPs to inmates with severe sleep apnea

6  which constitutes deliberate indifference for

7  causing the cessation of a continuing, prescribed

8  course of medical treatment for a life-threatening

9  condition.

10      257.    Winchester's refusal to provide Mr.

11  Barlean with a CPAP constituted deliberate

12  indifference to Mr. Barlean's Fourteenth Amendment

13  rights as a pretrial detainee.  Winchester is liable

14  to Mr. Barlean for deliberate indifference for

15  causing the cessation of a prescribed, continuous

16  course of a medical treatment plan for a life-

17  threatening condition.  Furthermore, as the Medical

18  Director, Winchester was the official with final

19  policymaking authority and gatekeeper to medical

20  devices who violated Mr. Barlean's right to medical

21

treatment as a pretrial detainee by refusing to
provide him with a CPAP.

258.    WHEREFORE, Plaintiff demands judgment
for compensatory and punitive damages against said
Defendants in this Count, and in addition thereto,
demands the award of attorney's fees and court costs
pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a
trial by jury on all issues so triable.

### COUNT FOURTEEN
### DEPRIVATION OF CIVIL RIGHTS
### BY VIOLATING SUBSTANTIVE DUE PROCESS CLAUSE
### OF THE FOURTEENTH AMENDMENT
### UNDER 42 U.S.C. § 1983
*(Against Roe)*

259.    Plaintiff hereby realleges and
incorporates by reference the allegations contained
in paragraphs 1 through 258 above.

260.    Booking Officer Roe, acting under color
of law, affirmatively acted to create Mr. Barlean's
exposure to danger from the other inmates by
refusing to give Mr. Barlean soap to remove his
USAFA ring from his swollen finger, ordering Mr.

1  Barlean to leave the ring on and by ordering Mr.
2  Barlean to proceed through the metal detector into
3  the jail was fully aware of the harm waiting to
4  befall him.

5      261.     Roe was also in a special-relationship
6  with Mr. Barlean as his Booking Officer.  Mr.
7  Barlean was in the group of pretrial detainees in
8  custody who depended on the state to satisfy basic
9  human needs.  At all times material to this count,
10 Roe had assumed control of Mr. Barlean sufficient to
11 trigger an affirmative duty to provide protection to
12 Mr. Barlean from violence from other inmates. Roe
13 failed to protect Mr. Barlean by refusing to follow
14 57 OK Stat § 57-21 (2021) and by affirmatively
15 ordering Mr. Barlean to enter the jail wearing his
16 USAFA ring.

17     262.     Roe knew Mr. Barlean would be in danger
18 or failed to exercise professional judgement
19 regarding that danger.  That danger being the
20 substantial risk of severe bodily harm at the hands
21

**COMPLAINT** Page **117** of **142**

1  of the much younger inmates would inflict on him

2  attempting to take his USAFA ring.  Roe violated Mr.

3  Barlean's fundamental liberty interest in being free

4  of punishment as a pretrial detainee and his liberty

5  interest in bodily integrity.  <u>Bell v. Wolfish</u>, 441

6  U.S. 520, 535 (1979).

7     263.     The Oklahoma County District Attorney

8  declined to prosecute Roe for violating 57 OK Stat §

9  57-21 (2021) for making Mr. Barlean a contraband

10 mule and bring money/gold into OCDC.

11     264.     There is no case law in existence where

12 a booking officer intentionally defies a felony

13 state statute prohibiting the introduction of

14 contraband into a penal institution by personally

15 ordering a detainee to carry gold, money or precious

16 stones into a jail or prison.

17     265.     As a direct and proximate result of

18 being forced to wear his USAFA ring into the OCDC,

19 Mr. Barlean sustained physical and emotional

20

21

1  injuries defending himself from inmates who took too

2  much interest in his ring.

3      266.     Roe's conduct shocks the judicial

4  conscience.  Roe's conduct was a deliberate

5  government action that was arbitrary and

6  unrestrained by established principles of private

7  right and distributive justice.

8      267.     Roe's conduct shocks judicial

9  conscience.  Roe arbitrarily and deliberately abused

10 his authority or employed it as an instrument of

11 oppression against Mr. Barlean for telling the

12 police earlier that they were in serious need of

13 remedial training.  Roe's actions were not related

14 to a legitimate nonpunitive governmental purpose.

15     268.     As a result of the misconduct of Roe

16 described in this Count, Mr. Barlean suffered loss

17 of liberty, physical harm to his body, great

18 physical pain, severe mental anguish, emotional pain

19 and suffering, and other grievous and continuing

20 injuries and damages.

21

1    269.    WHEREFORE, Plaintiff demands judgment

2  for compensatory and punitive damages against Roe,

3  and in addition thereto, demands the award of

4  attorney's fees and court costs pursuant to 42

5  U.S.C. §§ 1983 and 1988 and demands a trial by jury

6  on all issues so triable.

7

8                    **COUNT FIFTEEN**
   **FOR DECLARATORY/INJUNCTIVE RELIEF ENJOINING**
9  **PERFORMANCE OF UNCONSTITUTIONAL CONTRACT BETWEEN**
   **JAIL TRUST AND TURN KEY IN VIOLATION OF THE EIGHTH**
10                **AND FOURTEENTH AMENDMENTS**
              *(Against Jail Trust and Turn Key)*
11
       270.    Plaintiff hereby realleges and
12
   incorporates by reference the allegations contained
13
   in paragraphs 1 through 269 above.
14
       271.    Mr. Barlean and other inmates with
15
   severe sleep apnea were not provided with CPAPs by
16
   Turn Key during his stay in June 2021.
17
       272.    Current inmates are not being provided
18
   with CPAPs by Turn Key.
19

20

21
                    **COMPLAINT** Page **120** of **142**

1      273.     Future inmates will not be provided

2   with CPAPs by Turn Key under the current contract

3   with the Jail Trust.  **(EXHIBIT P)**.

4      274.     The Recitals of the current contract

5   state that the purpose of the contract is to let the

6   Jail Trust contract with Turn Key to provide Medical

7   Staff and Administration for the OCDC.

8      275.     The contract calls for Turn Key to

9   honor their constitutional duty to the inmates

10  before corporate profits in Paragraph 1.3 titled

11  COMPLIANCE WITH APPLICABLE LAW:

12          "The Contractor shall comply with
            applicable standards and laws set forth by
13          the United States Constitution, federal
            law, and the laws of the state of Oklahoma,
14          as well as the standards set by the United
            States Department of Justice, for the
15          duration of this Agreement with the
            Agency."
16
    276.     The contract is indisputably
17
    unconstitutional within its four corners.
18
    Paragraph 1.8 SPECIALTY SERVICES last sentence
19
    reads:
20

21

1           "The Contractor shall not be responsible
            for the provision of eyeglasses, contact
2           lenses, hearing aids, hearing aid supplies
            or any other prosthetic devices."
3

4      277.    The U.S. Supreme Court recognized in

5  Estelle v. Gamble, 429 U.S. 97, 103 (1976), that "An

6  inmate must rely on prison authorities to treat his

7  medical needs; if the authorities fail to do so,

8  those needs will not be met."  Considering this, the

9  Court held that the State has a constitutional

10 obligation, under the Eighth Amendment, to provide

11 adequate medical care to those whom it has

12 incarcerated." Id. at 104.

13     278.    The most frequently used treatment for

14 severe sleep apnea like Mr. Barlean's is a

15 prescribed course of respiratory therapy employing

16 a machine commonly known as a nasal CPAP (continuous

17 positive airway pressure). In this method of

18 therapy, a prosthetic device is employed consisting

19 of an airflow generator, a flexible hose and a nasal

20 mask (or pillows) in which air is pumped into the

21

lungs through the nose or nose and mouth during

spontaneous breathing.  Courts have long recognized

severe sleep apnea as a life-threating condition.

279.   The U.S. the Supreme Court held, as it

has before, that the Eighth Amendment protects

against future harm to inmates, noting that "[i]t

would be odd to deny an injunction to inmates who

plainly proved an unsafe, life-threatening condition

in their prison on the ground that nothing yet had

happened to them." Helling v. McKinley, 509 U.S. 25,

33 (1993).

280.   Denying a CPAP to an inmate with severe

sleep apnea constitutes cruel and unusual punishment

under the Eighth Amendment by causing them to risk

stroke or death whenever they sleep without one.

281.   Some courts have held that not

providing eyeglasses to inmates with severe vision

problems also constitutes an Eighth Amendment

violation. "The Court finds that Plaintiff has

stated a claim under the Eighth Amendment. The need

1  for eyeglasses can constitute a serious medical

2  need:" Bergen v. Wisconsin, No. 20-CV-813-JPS (E.D.

3  Wis. Jan. 13, 2022).

4      282.     WHEREFORE, Mr. Barlean prays this

5  Honorable Court:

6      A.   Issue a Declaratory Judgment that the

7  the contract between the Jail Trust and Turn Key is

8  unconstitutionally violative of inmates' rights

9  under the Eighth and Fourteenth Amendments and the

10  Americans with Disabilities Act by denying the

11  procurement of breathing prosthetic devices (CPAPs)

12  for inmates with severe obstructive sleep apnea.

13      B.   Enter a permanent injunction directing

14  that: (a) Turn Key and the Jail Trust formulate and

15  implement an CPAP policy that meets the prevailing

16  standard of care, including identifying inmates with

17  severe sleep apnea; (b) providing such inmates with

18  CPAPs in a timely manner; and (c) any further

19  appropriate injunctions to prevent the future

20

21

1  deprivation of the rights of Mr. Barlean, current

2  inmates and future inmates.

3          C.   Award Mr. Barlean nominal damages;

4          D.   Award Mr. Barlean costs, including

5  reasonable attorneys' fees under 29 U.S.C. §794a and

6  other relevant provisions of law; and

7          E.   Allow such other and further relief to

8  which Mr. Barlean may be entitled.

9

10                   **COUNT SIXTEEN**
                 **DEPRIVATION OF CIVIL RIGHTS**
11           **BY DANGEROUS CONDITIONS OF CONFINEMENT**
                 **UNDER 42 U.S.C. § 1983**
12                  (*Against Doe #2*)

13      283.    Plaintiff hereby realleges and

14  incorporates by reference the above allegations

15  contained in paragraphs 1 through 282 above.

16      284.    Mr. Barlean was a pretrial detainee.

17  Under the Due Process Clause of the Fourteenth

18  Amendment, Mr. Barlean had a well-established right

19  to not be punished before an adjudication of guilt

20

21

1  in accordance with due process of law.  Bell v.

2  Wolfish, 441 U.S. 520, 535 (1979).

3     285.    Mr. Barlean had a condition of

4  confinement that had no penological or governmental

5  purpose that was intentionally imposed by John Doe

6  #2 to continue Mr. Barlean's punishment.  Mr.

7  Barlean watched Doe #2 tell two Universal Aryan

8  Brotherhood gang members that he was a former

9  prosecutor who got paid to put people in jail.

10    286.    This condition of confinement had no

11  rational connection to jail administration.

12    287.    In Bell at 539, the Court held: "[I]f a

13  restriction or condition is not reasonably related

14  to a legitimate goal – if it is arbitrary or

15  purposeless – a court permissibly may infer that the

16  purpose of the governmental action is punishment

17  that may not constitutionally be inflicted upon

18  detainees qua detainees."

19    288.    Prison officials have a duty to protect

20  prisoners from violence at the hands of other

21

1  prisoners.  Farmer v. Brennan, 511 U.S. 825, 833

2  (1994).  Doe #2 knew or should have known the

3  substantial risk of serious harm associated with

4  identifying an inmate as a former member of the law

5  enforcement community in the Maximum-Security Gang

6  Pod.  After Doe #2 outed Mr. Barlean, he took no

7  steps to reduce or protect Mr. Barlean from

8  substantial risk of serious harm at the hands of

9  retaliating inmates.

10     289.    Doe #2 was deliberately indifferent to

11 the foreseeable risk of substantial harm to Mr.

12 Barlean by other inmates retaliating against Mr.

13 Barlean for being a former prosecutor.

14     290.    Mr. Barlean's dangerous condition of

15 confinement violated his right under the Fourteenth

16 Amendment to not be punished as a pretrial detainee.

17 Mr. Barlean suffered punishment at the hands of

18 other inmates while defending himself and suffered

19 severe emotional harm from listening to threats from

20 other inmates of what they going to do to his

21

1   "prosecutor ass" which exacerbated Mr. Barlean's

2   PTSD and removed the therapeutic gains made in the

3   last ten years.  "Suffering physical assaults while

4   in prison is not part of the penalty that criminal

5   offenders pay for their offenses against society."

6   Benefield v. McDowall, 241 F.3d 1267, 1271 (10th

7   Cir. 2001).

8       291.    Being identified as a former prosecutor

9   in the Maximum-Security Gang Pod is on par with

10  being labeled a "snitch".  The Tenth Circuit Court

11  of Appeals has long recognized that labeling an

12  inmate a "snitch" or otherwise inciting other

13  inmates to harm an inmate states an Eighth Amendment

14  violation, regardless of whether the inmate is ever

15  actually harmed.  Id.

16      292.    As a result of the misconduct of Doe #2

17  described in this Count, Mr. Barlean suffered

18  unrelenting and life-threatening fear, loss of

19  sleep, loss of liberty, physical harm to his body,

20  great physical pain and suffering, severe mental

21

anguish, emotional pain and suffering, and other grievous and continuing injuries and damages.

293.   WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Doe #2, and, in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

**COUNT SEVENTEEN**
**DEPRIVATION OF CIVIL RIGHTS**
**BY UNCONSTITUTIONAL GOVERNMENT POLICY**
**OF NOT PROVIDING PRESCRIBED**
**MEDICAL PROSTHETIC DEVICES TO INMATES**
**UNDER 42 U.S.C. § 1983**
*(Against Jail Trust and Turn Key)*

294.   Plaintiff hereby realleges and incorporates by reference the above allegations contained in paragraphs 1 through 293 above.

295.   Turn Key, by virtue of its contractual relationship with the Jail trust, is a state agent performing the state act of providing medical care to OCDC inmates under the color of law for The Jail

1  Trust.   The Contract contains the official

2  governmental policy of the Jail Trust regarding the

3  provision of CPAPs to inmates with severe

4  obstructive sleep apnea.   This policy was the moving

5  force behind the deprivation of Mr. Barlean's right

6  to adequate medical care as a pretrial detainee.

7        296.     Turn Key, under the Contract, shares

8  with the Jail Trust the same governmental policy of

9  not providing CPAPs to inmates with the life-

10  threatening medical condition of severe Obstructive

11  Sleep Apnea.

12        297.     Brock and Winchester executed this

13  policy by denying Mr. Barlean's request for a CPAP

14  causing him to suffer cruel and unusual punishment

15  in violation of the Eighth Amendment and the Due

16  Process Clause of the Fourteenth Amendment,  Said

17  denial deprived Mr. Barlean, a pretrial detainee, of

18  his right to bodily integrity and right to medical

19  treatment by causing the cessation of his ongoing,

20  prescribed medical treatment for the life

21

**COMPLAINT** Page **130** of **142**

1 | threatening condition of severe obstructive sleep
2 | apnea while confined at OCDC where Mr. Barlean was
3 | totally reliant upon Turn Key for medical treatment.

4 |    298.    Turn Key's policy of not providing
5 | CPAPs to inmates caused Mr. Barlean to suffer
6 | emotional and physical injuries and will continue to
7 | cause said injuries to all current and future
8 | inmates at OCDC who have severe sleep apnea.  Turn
9 | Key and the Jail Trust are liable for Mr. Barlean's
10 | damages resulting from their unconstitutional
11 | policy.  Monell v. Department of Social Services of
12 | City of New York, 436 U.S. 658, 694-695. (1978).
13 | See, Jenkins v. Wood, 81 F.3d 988, 993-994 (10th
14 | Cir. 1996).

15 |    299.    As a direct and proximate result of the
16 | unconstitutional contract executed by the Jail Trust
17 | and Turn Key containing their official policy of not
18 | providing prosthetic devices to inmates and its
19 | execution of said policy on Mr. Barlean who was
20 | denied the provision of a CPAP, he suffered loss of

21 |

1  liberty, physical harm, experienced great physical

2  pain, mental anguish and fear of imminent death,

3  emotional pain and suffering, and other grievous and

4  continuing injuries and damages.

5     300.    WHEREFORE, Plaintiff demands judgment

6  for compensatory and punitive damages against the

7  Jail Trust and Turn Key for their <u>Monell</u> violation,

8  and, in addition thereto, demands the award of

9  attorney's fees and court costs pursuant to 42

10  U.S.C. §§ 1983 and 1988 and demands a trial by jury

11  on all issues so triable.

12

13              **COUNT EIGHTEEN**
          **DEPRIVATION OF CIVIL RIGHTS**

14        **BY VIOLATING MR. BARLEAN'S**
    **LIBERTY INTEREST IN SELF-DEFINITION**

15          **UNDER 42 U.S.C. § 1983**
   *(Childers, Willis, Jacobsen, Solis and Garcia)*

16

17     301.    Plaintiff hereby realleges and

incorporates by reference the above allegations

18

contained in paragraphs 1 through 300 above.

19

20     302.    Officer Defendants deprived Mr. Barlean

of his liberty interest in self-definition, which is

21

1  protected by the Due Process Clause of the

2  Fourteenth Amendment to the United States

3  Constitution.  This clause prohibits the government

4  from depriving individuals of their life, liberty,

5  or property, without due process of the law.

6      303.    The right to self-definition is a

7  fundamental aspect of liberty, giving individuals

8  the power to determine their own identity, beliefs,

9  and personal choices.  As previously discussed

10 above, Mr. Barlean can no longer run for public

11 office as a member of the Republican Party due to

12 the false stigmatization and defamation by

13 imputation of a false criminal history and

14 false/omitted facts in the police reports.  The

15 officers of the OCPD usurped Mr. Barlean's liberty

16 interest and defined him the way the way they wanted

17 him defined to enhance the likelihood of the DA

18 filing charges against him.

19      304.    Political philosopher John Locke

20 observed that "every Man has a Property in his own

21

1 | Person." Two Treatises, Bk. II, § 27.  He also wrote
2 | about the components of autonomy, bodily integrity,
3 | and self-determination, noting that "so far as a man
4 | has power to think, or not to think: to move or not
5 | to move, according to the preference or direction of
6 | his own mind; so far is a man free." Locke, An Essay
7 | Concerning Human Understanding, Bk. II, ch. 21, § 8
8 | (27th ed. 1836).  Many federal courts are now
9 | recognizing, as a class, people who exercise their
10 | liberty interest in self-identification by
11 | identifying as gay or transgender and use the same
12 | constitutional analysis and safeguards long enjoyed
13 | by members of a class based on immutable
14 | characteristics.  Bostock v. Clayton County, 140 S.
15 | Ct. 1731 (2020).
16 |     305.    At the core of the natural rights of
17 | liberty and the pursuit of happiness is the right of
18 | personal autonomy, which includes the ability to
19 | control one's own body, to assert bodily integrity,
20 | and to exercise self-determination.
21 |

1     306.    The concepts of control over one's body

2 and of self-determination have their roots in common

3 law, as the United States Supreme Court noted in

4 Union Pacific Railway Co. v. Botsford, 141 U.S. 250,

5 251 (1891):

6         "No right is held more sacred or is more
           carefully guarded by the common law than
7         the right of every individual to the
           possession and control of his own person,
8         free from all restraint or interference of
           others unless by clear and unquestionable
9         authority of law. As well said by Judge
           Cooley: 'The right to one's person may be
10        said to be a right of complete immunity; to
          be let alone.'"  Citing T. Cooley, A
11        TREATISE ON THE LAW OF TORTS 29 (2d ed.
          1888).

12     307.    In the case at bar, the Officer

13 Defendants acting under color of law, unjustly

14 arrested Mr. Barlean and stigmatized him in their

15 reports as a burglar, embezzler and inaccurate wife

16 shooter which stripped him of his right of personal

17 autonomy (notwithstanding the initial damage of

18 being sent to Maximum-Security Gang pod).

19     308.    Courts have recognized that citizens

20 who exercised their liberty interest of personal

21

1 autonomy by self-identifying as the opposite gender

2 of which they were born, have the right under Title

3 VII to have their employer's healthcare plan to

4 include sex reassignment surgery. *See*, <u>Fletcher v.</u>

5 <u>Alaska</u>, 443 F. Supp. 3d 1024 (D. Alaska 2020).

6     309.    As a direct and proximate result of the

7 false arrest and defamatory *per se* police reports,

8 Mr. Barlean was deprived of his civil rights as

9 guaranteed by the Due Process Clause of the

10 Fourteenth Amendment of the U.S. Constitution and

11 suffered loss of liberty, loss of property,

12 humiliation, degradation, loss of future business

13 and political opportunities, apprehension for his

14 bodily security, physical pain, and other mental and

15 emotional harms, which continue to this day and are

16 likely to continue.

17     310.    WHEREFORE, Plaintiff demands judgment

18 for compensatory and punitive damages against

19 Defendant Officers, and in addition thereto, demands

20 the award of attorney's fees and court costs

21

1  pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

2  trial by jury on all issues so triable.

3

4                          **COUNT NINETEEN**
                    **DEPRIVATION OF CIVIL RIGHTS**
5       **BY WARRANTLESS ARREST OF MR. BARLEAN IN HIS**
         **HIS HOME IN VIOLATION OF FOURTH AMENDMENT**
6                    **UNDER 42 U.S.C. § 1983**
                        *(Officer Defendants)*
7

8       311.    Plaintiff hereby realleges and

9  incorporates by reference the above allegations

10 contained in paragraphs 1 through 310 above.

11      312.    Mr. Barlean was arrested by the Officer

12 Defendants acting under color of law on his home's

13 covered front porch without a warrant or probable

14 cause.

15      313.    Defendant Officers violated Mr.

16 Barlean's well-established Fourth Amendment right to

17 not be arrested without a warrant in his home or its

18 curtilage or an exception to the warrant

19 requirement.  Payton v. New York, 445 U.S. 573, 586

20 (1980).

21

1    314.    It is well settled that the protection

2  provided by the Fourth Amendment to a home also

3  extends to the curtilage of the residence.  Oliver

4  v. United States, 466 U.S. 170, 180 (1984).

5    315.    Mr. Barlean was seized by the Officer

6  Defendants without a warrant while he was still

7  inside his home.  He was summoned to the front door

8  only by their knocking.  Mr. Barlean submitted to

9  their authority because he saw through the glass

10  door four Defendant officers and brandished guns.

11    316.    A seizure of a person occurs only when

12  the defendant submits to an officer's show of

13  authority.  To constitute a seizure, there must be,

14  in addition, a submission to the officer's show of

15  authority—for example, the person stops as a result

16  of the officer's command.  California v. Hodari D,

17  499 U.S. 621, 111 S. Ct. 1547 (1991).

18    317.    Mr. Barlean complied with their next

19  command given in an aggressive tone of voice to

20  unlock and open the front door and to step outside

21

onto the porch. He was then ordered to turn around,
handcuffed and placed in the back seat of a patrol
car.

318.    Mr. Barlean's arrest was made without
warrant, probable cause or exigent circumstances in
violation of his constitutional right to be free
from warrantless seizure absent probable cause and
exigent circumstances.

319.    Mr. Barlean's right to privacy was
violated when he was verbally seized by the
Defendant Officers while he was inside his home
behind a locked door.  Mr. Barlean was not in a
public place, and no one could touch him or hear
what he was saying to the 911 operator from the
front porch.

320.    As a direct and proximate result of the
unreasonable seizure, Mr. Barlean was deprived of
his civil rights as guaranteed by the fourth
Amendment and the Due Process Clause of the
Fourteenth Amendment of the U.S. Constitution and

1  suffered loss of liberty, loss of property,

2  humiliation, degradation, loss of future business

3  and political opportunities, apprehension for his

4  bodily security, physical pain, and other mental and

5  emotional harms, which continue to this day and are

6  likely to continue.

7      321.    WHEREFORE, Plaintiff demands judgment

8  for compensatory and punitive damages against

9  Defendant Officers, and in addition thereto, demands

10  the award of attorney's fees and court costs

11  pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

12  trial by jury on all issues so triable.

13

14                    **RELIEF REQUESTED**

15     WHEREFORE, Mr. Barlean respectfully prays for

16  judgment against Defendants, as to all causes of

17  action as follows:

18     1.   Award of general, special and compensatory

19  damages in an amount to be proven at trial, but in

20  no event less than $8,600,000 U.S. Dollars.

21

1 | Plaintiff reserves the right to amend this amount
2 | prior to or during trial, as the evidence requires;

3 |     2.   Punitive Damages against individually named
4 | Defendants, as allowed by law;

5 |     3.   Attorneys' fees pursuant to 42 U.S.C. §
6 | 1988;

7 |     4.   Attorney's fees and court costs pursuant to
8 | 42 U.S.C. §12205 and any other appropriate statute;

9 |     5.   Declaratory relief holding the contract
10 | between Jail Trust and Turn Key unconstitutional.

11 |     6.   Injunctive relief enjoining the performance
12 | of the unconstitutional contract until it is
13 | constitutionally repaired;

14 |     7.   Costs of suit incurred herein;

15 |     8.   Enter judgment against Defendants, jointly
16 | and severally, on each count set forth herein, with
17 | pre-judgment interest from June 7, 2021, until the
18 | day of judgment;

19 |     9.   Set a date for Jury Trial; and

20 |
21 |

1       10.  Such other and further relief as the Court

2  may deem just and proper.

3                      Respectfully submitted,

4                      *Plaintiff Pro Se*

5

6                      Kelly J. Barlean, OBA #31286
                       3101 N.W. 20th Street
7                      Oklahoma City, OK 73107
                       405-326-7870
8                      kellybarlean@gmail.com

9

10

11

12

13

14

15

16

17

18

19

20

21
                  **COMPLAINT** Page **142** of **142**