## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

**FILED**

(1) KELLY J. BARLEAN,

PLAINTIFF.

v.

JUN 20 2023

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT. WESTERN DIS. OKLA.
BY_____,DEPUTY

Case No. CIV -23-00488-JD

(1) OKLAHOMA COUNTY CRIMINAL
    JUSTICE AUTHORITY,
(2) TURN KEY HEALTH CLINICS,
    L.L.C.,
(3) JESSE CHILDERS,
(4) DUSTIN WILLIS,
(5) TAYLOR GARCIA,
(6) BRANDON LEE,
(7) DAMEN JACOBSEN,
(8) ADRIAN DOMINGUEZ SOLIS,
(9) JORDACHE ROE,
(10) BRITNEY PETTIT,
(11) MARK WINCHESTER, and
(12) JOHN AND JANE DOES 1-12.

DEFENDANTS.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND DECLARATORY
AND INJUNCTIVE RELIEF

COMES NOW, the *Plaintiff Pro Se*, KELLY J. BARLEAN, upon personal

knowledge and upon information and belief, alleges the following:

### JURISDICTION AND VENUE

1.    Plaintiff brings this action pursuant to 42 U.S.C. §1983, 42 U.S.C. §12132

and 29 U.S.C. §794.

2.    Jurisdiction is proper pursuant to 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4),

which provide for original jurisdiction in this honorable Court of all suits brought

FIRST AMENDED COMPLAINT - Page 1 of 54

pursuant to U.S.C. § 1983. Jurisdiction is also conferred by 28 U.S.C. § 1331 because the claims for relief derive from the United States Constitution and the laws of the United States. Jurisdiction is also conferred by 42 U.S.C. § 12133 because one of Plaintiff's claims for relief derives from Section 202 of the Americans with Disabilities Act, 42 U.S.C. § 12132. Jurisdiction to grant Declaratory/Injunctive Relief is conferred by 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

3.    Venue before this Court is proper under U.S.C. §1391(b)(1) because all Defendants are located and/or reside in Oklahoma within the Western District and U.S.C. §1391(b)(2) as all events or omissions occurred in the Western District of Oklahoma.

PARTIES

4.    At all times relevant to this Complaint, Plaintiff, Kelly Barlean, (hereinafter "Mr. Barlean"), an individual and citizen of the United States of America, resides in the County of Oklahoma, State of Oklahoma.

5.    Defendant Oklahoma County Criminal Justice Authority (hereinafter "OCCJA" or "Jail Trust") is a statutorily created public Trust created to assist Oklahoma County in operating the OCDC. The Jail Trust is the County entity contractually tasked with the management and operations, including the promulgation of administrative policies at the OCDC. The Jail Trust is sued under Mr. Barlean's municipal liability theory under §1983 and *Respondeat Superior* liability theory under Title II of the ADA.

6.    Defendant Turn Key Health Clinics, LLC, (hereinafter "Turn Key") is an Oklahoma limited liability company doing business in Oklahoma County, Oklahoma by,

FIRST AMENDED COMPLAINT - Page 2 of 54

pursuant to contract, providing medical services to OCDC inmates with limited direct supervision by the OCCJA, undertaking that task for profit. Turn Key was at all times relevant hereto responsible, in part, acting under color of law, for providing medical services, supervision and medication to Mr. Barlean while he was in custody of the OCCJA. Turn Key was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the OCDC, and for training and supervising its employees. Turn Key was, at all times relevant hereto, contractually endowed by OCCJA with powers and/or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations. Turn Key is sued under Mr. Barlean's municipal liability theory under §1983 and *Respondeat Superior* liability theory under Title II of the ADA.

7.     Defendant Jesse Childers, (hereinafter "Childers"), at all relevant times herein, was acting under the color of law as an individual employed as an OCPD police officer is sued in his individual capacity.

8.     Defendant Dustin Willis, (hereinafter "Willis"), at all relevant times herein, was acting under the color of law as an individual employed as an OCPD police detective is sued in his individual capacity.

9.     Defendant Taylor Garcia, (hereinafter "Garcia"), at all relevant times herein, was acting under the color of law as an individual employed as an OCPD police officer is sued in her individual capacity.

10.     Defendant Brandon Lee, (hereinafter "Lee"), at all relevant times herein, was acting under the color of law as an individual employed as an OCPD police officer is sued in his individual capacity.

11.     Defendant Adrian Dominguez Solis, (hereinafter "Solis"), at all relevant times herein, was acting under the color of law as an individual employed as an OCPD police officer is sued in his individual capacity.

12.     Defendant Damen Jacobsen (hereinafter "Jacobsen"), at all relevant times herein, was acting under the color of law as an individual employed as an OCPD police officer is sued in his individual capacity.

13.     Defendant Jordache Roe, (hereinafter "Roe"), at all relevant times herein, was acting under the color of law as employee and/or agent of the Jail Trust and is sued in his individual capacity.

14.     Defendant Britney Pettit, (hereinafter "Pettit"), at all relevant times herein, was acting under the color of law as employee and/or agent of the Jail Trust and Turn Key is sued in her individual capacity.

15.     Defendant Mark Winchester, (hereinafter "Winchester"), at all relevant times herein, was acting under the color of law as employee and/or agent of the Jail Trust and Turn Key is sued in his individual capacity.

16.     Defendants John and Jane Does 1 through 12 are sued as fictitious names, their true names and capacities being unknown to Plaintiff. When ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities. Plaintiff is

informed and believes and thereon alleges that each of the fictitiously named Defendants were acting under color of law at all relevant times herein, as employee and/or agent of the Jail Trust or Turn Key is sued in their individual capacities. Each reference in this Complaint to "Defendant", "Defendants", or a specifically named Defendant refers to and includes all Defendants sued under that above fictitious name(s).

17.     All references to "Officer Defendants" or "Defendant Officers" in this Complaint refers to all defendants employed by the OCPD including officers Doe.

## FACTUAL ALLEGATIONS

*First Two hours in Handcuffs.*

18.     Plaintiff hereby realleges and incorporates by reference the allegations contained in above paragraphs 1-18.

19.     Shortly after midnight on June 7, 2021, Cynthia Minor, (hereinafter "Ms. Minor"), after an evening of drinking and karaoke, arrived at Mr. Barlean's home to retrieve some clothes she left there when she moved out two days earlier.

20.     After they had an argument, Ms. Minor pulled a .45 pistol on Mr. Barlean, aiming it at his left temple as he was watching television. Mr. Barlean proceeded to disarm Ms. Minor, and in the process, there was an accidental discharge in the upstairs master bathroom. Ms. Minor then called 911 and alleged Mr. Barlean just tried to shoot her and that he raped her the prior evening.

21.     When the Defendant Officers arrived at Mr. Barlean's property, they drew their weapons and approached Mr. Barlean home. (VIDEO FILE RAY #1 @ 2:06).

They could see from the front lawn through the open front door and locked glass storm door that he was standing alone, unarmed, and speaking into his cell phone. (VIDEO FILE SOLIS #1 @ 2:07).

22. The Officer Defendants then pounded on the locked glass door and saw him waving at them to come inside. As he was nearing the door, Mr. Barlean was commanded to step outside by Solis. After unlocking the door and stepping out onto the porch, he was immediately ordered to turn around and put his hands behind his back. Solis and Jacobsen each grabbed and pulled an arm of Mr. Barlean's behind his back as Garcia handcuffed him. He was then immediately placed in the back seat of Solis' patrol car. (VIDEO FILE SOLIS #1 @ 2:10).

23. Mr. Barlean asked why he was being arrested, the Officer Defendants obfuscated by telling him that he was not under arrest and that was only being detained.

24. Mr. Barlean told Solis that his back and his titanium knee were becoming increasingly more painful and that his claustrophobia was making him sick, and he needed to vomit. Solis then opened a back door and allowed Mr. Barlean to sit with his legs outside the vehicle then began dry heaving. After fifteen minutes, Mr. Barlean's pain level increased and Solis had Mr. Barlean sit on the curb in front of a neighbor's home. His pain kept escalating and begged to be taken to jail.

25. Mr. Barlean was a former city attorney and prosecutor and told the Officer Defendants that they needed serious remedial training.

26. The Officer Defendants finished getting statements from Ms. Minor and

Mr. Barlean less than a half hour after their arrival.

27.     Mr. Barlean was handcuffed ninety minutes after the investigation ended.

28.     Solis asked Mr. Barlean if he could enter the house and retrieve the two handguns that were involved in the incident.  Mr. Barlean chided Solis asking why he was suddenly concerned about the loaded handguns he saw through the door and told him that his former police colleagues would have immediately secured the weapons and conducted a protective sweep a half hour ago as he was being arrested and handcuffed.

29.     Mr. Barlean asked Solis when the police reports would be available from the OCPD Records Department.  Solis responded with:

> "Shouldn't you know?
> You seem to know everything else.
> I thought you were so smart."
> (VIDEO FILE SOLIS #2 @ 7:50).

30.     Mr. Barlean was in excruciating pain and in severe mental distress and kept asking the officers every ten minutes what the delay was about and received no response until he had been in handcuffs for an hour when he was informed Supervising Officer Childers, was on enroute to the scene.

31.     Childers arrived approximately one hour after Mr. Barlean was handcuffed and placed in the back of a patrol car.  No attempt was made by the Officer Defendants to procure arrest or search warrants during that time.

32.     A half hour before Childers arrived, Officer Jacobsen told Mr. Barlean, that in his opinion, he did not think anyone was going to jail.  (VIDEO FILE JACOBSEN #1

@ 36:20).  He also informed Mr. Barlean that Ms. Minors' stories "are not adding up"

(VIDEO FILE JACOBSEN #1 @ 9:01) and that "her story's isn't really making sense."

FILE JACOBSEN #1 @ 14:05).

33.     When Childers arrived, Mr. Barlean refused to tell him what happened that

evening but did tell him that his leadership exposed his subordinates to unacceptable risk

of harm because they were so intent on arresting him, they forgot the fundamentals of

officer safety by failing to secure the guns and conducting a protective sweep.

34.     Childers quit speaking with Mr. Barlean after he inquired whether Childers

could even do one pull-up.

35.     A few minutes later, Lee, Garcia and Childers, without a search warrant,

consent or probable cause or exigent circumstances entered Mr. Barlean's home and

made video recordings of the private and personal areas of his home including the

contents of his bathroom medicine cabinet with both their Body Worn Cameras

(hereinafter "BWC") and their personal phone cameras and seized his firearms.

36.     During the search, Lee told Childers that he observed a gun safe in the

garage, to which Childers responded, "You don't have to worry about that." (VIDEO

FILE RAY #3 @ 8:55).

37.     In his report, Detective Willis put in his report that Lee noted that the guns

were being taken from Mr. Barlean's home for "safekeeping". (EXHIBIT A).

38.     Lee put in his report that Ms. Minor "had a strong odor of an alcoholic

beverage coming from her breath and person also." (WILLIS REPORT PAGE 4).

39.    Ms. Minor has a history of criminal violence.  She was charged with felony assault and battery with a deadly weapon in Texas when she tried to shoot her former boyfriend but pled guilty to a reduced charge. (EXHIBIT B).

40.    Ms. Minor's speech was rambling.  Garcia and Jacobsen had to stop her numerous times during the interview in mid-answer and steer her back to the posed question. She also kept repeating to 911 operators and to the officer defendants that it was her word against Mr. Barlean's.

41.    Willis' report contained three different versions of events Ms. Minor gave that evening and Jacobsen's report contained a fourth version.

42.    Ms. Minor stated that Mr. Barlean pulled a gun on her in the upstairs bathroom, so she fled to the adjacent bedroom and grabbed a .45 pistol and ran back into the bathroom, but he was not in there.

43.    Ms. Minor said she then ran across the bathroom, looked out the other door, saw Mr. Barlean in the hallway and pointed her gun at him and that he lunged at her, and the gun went off striking a cabinet and going into the ceiling.

44.    The holes in the cabinet show that a bullet entered the cabinet almost vertically. The cabinet entry point was 72" above the ground and the entry point into the ceiling was 5" inches off perpendicular from the cabinet entry point. (EXHIBIT C).  The cabinet with a bullet hole is not on the hall door side of the bathroom, it is on the opposite side of the bathroom on the wall with the bedroom doorway.

45.    After the search of his home, Mr. Barlean was stuffed into the back seat of

the patrol car with his hands still handcuffed behind his back. Solis denied his requests to have the handcuffs removed or be cuffed with his hands in front and to use the seatbelt.

46.     The ride to OCDC took almost a half hour, which is twice as long as normal. Solis made occasional sharp turns, smashing Mr. Barlean's shoulders against the side windows and twisting his lower back and knees. Solis also sometimes hit the brakes too hard and Mr. Barlean's head and face hit the seat/cage in front of him. When they arrived at OCDC, Solis removed the handcuffs from Mr. Barlean whose hands and knuckles were grotesquely swollen from being in handcuffs for two hours.

*Eight Days in OCDC.*

47.     When Mr. Barlean started the booking process at the jail, he could not remove his USAFA ring so he asked the Booking Officer Roe for some soap so he could slide the ring over his knuckle. Solis was standing next to Roe and overheard Mr. Barlean. Solis and Roe had a brief, whispered conversation then Solis left the room and walked back in after a couple minutes carrying his cell phone in hand.

48.     Solis again quietly conferred with Roe who then ordered Mr. Barlean to keep the ring on and commanded him to walk through the metal detector into the secure part of the jail. (EXHIBIT D).

49.     During the medical intake, Mr. Barlean told Nurse Pettit that he had severe obstructive sleep apnea and has been using a CPAP machine since 1999. After answering all Nurse Pettit's questions, Mr. Barlean was assigned to General Population.

50.     The evening of June 8, 2021, Mr. Barlean made a call from his cell for

emergency medical services as he believed that he was starting to have a stroke because he did not have a CPAP and knew his blood pressure was at a level that he had to go to the emergency room as he was experiencing loud ringing in his ears and tunnel vision.

51.     Mr. Barlean was taken to the infirmary.  He told the nurse that his blood pressure was high because he had severe sleep apnea and has been on a CPAP machine since 1999 and asked for one but was told they were not provided to inmates.

52.     A few hours after Mr. Barlean returned from the infirmary, another inmate was deposited in his cell screaming obscenities and pounded on the door for a long time after it closed. After he calmed down on the upper bunk, he asked Mr. Barlean how he smuggled the ring inside the jail and asked to see the ring.  Mr. Barlean declined, and the cellmate made an aggressive move towards him.  Mr. Barlean was forced to fight.

53.     The next morning, Mr. Barlean discovered the Classification Officer deemed him a threat and ordered him housed in the Maximum-Security Gang Pod.

54.     A guard told Mr. Barlean that they had him classified as an unaffiliated gang member. When the guard tried to place Mr. Barlean in his assigned cell, he found the cell full with two inmates on the bunkbed and one on the concrete floor with a mattress pad.  Then the guard then tried to place Mr. Barlean into the adjacent cell but it was similarly overcrowded. The next cell had a vacant concrete floor for Mr. Barlean.

55.     After three nights on the concrete floor, a Peckerwood gang member was being released and was carrying his pad down the hall. Mr. Barlean yelled at the escorting guard and asked if he could have the mattress pad.  The guard opened the cell

door and handed Mr. Barlean the still warm mattress pad that he would be using for the next four nights. Mr. Barlean tried to clean some of the bedbugs off the mat, but at that point, it really did not matter anymore. (EXHIBIT E).

56.     Mr. Barlean saw guard Doe #2 telling two Universal Aryan Brotherhood gang members "The old guy is a prosecutor and got paid to put people in jail."

57.     After being identified as a prosecuting attorney, Mr. Barlean was threatened with severe bodily harm and rape by other inmates. Mr. Barlean was scared.

58.     Mr. Barlean was forced to defend himself almost daily.

59.     Mr. Barlean met with Medical Director Doctor Winchester. He told Winchester about the extra attention he had been receiving because of his ring, pulled the ring off his finger and tried to hand it to the doctor for safekeeping – which he refused saying he could not do it but would ask around.

60.     Mr. Barlean told Winchester that his former spouse tried to drop off his CPAP, but the OCDC would not accept it without a prescription and then asked him for one from the infirmary. Winchester told him that there were no CPAPs for inmates.

61.     Winchester saw Mr. Barlean on the seventh day of his incarceration without a CPAP and still running on adrenaline staying alert to stay alive. Winchester noted that Mr. Barlean was "shakey [sic] and weak." Winchester put in his notes that if Mr. Barlean was not released the following week, he was going to contact the VA Hospital and request a CPAP prescription from them.

*Kelly's devastating injuries.*

62.     Surviving the punishment meted out by the OCPD and the OCDC came at a high cost to Mr. Barlean. He was medically discharged from Army and rated 100% disabled by the Department of Veterans Affairs with 50% coming from Post Traumatic Stress Disorder (hereinafter "PTSD").

63.     Mr. Barlean was handcuffed with his arms behind his back for two hours. The pain from his pre-existing military injuries was excruciating and distressing. His shoulders were sore from the ride to jail and wrists were grotesquely swollen, which left red marks on parts of his wrists for over a week.

64.     Mr. Barlean received multiple abrasions and bruises on his body and experienced physical pain and terror while defending himself. All vestiges of physical injuries (except for the bedbug bites) dissipated within two weeks of his release but his back and knees remained sore and tender for several weeks.

65.     Mr. Barlean survived by abandoning the therapeutic gains and mental management techniques he learned the last decade to control his PTSD to protect himself in the Maximum-Security Gang Pod where he was 20-40 years older than the inmates.

66.     After he was released from OCDC, Mr. Barlean descended down a dark, self-destructive path.

67.     Before the grace of God allowed Mr. Barlean to regain his mental management ability, he began to drink alcohol heavily and become more aggressive. The darkness caused Mr. Barlean to spend thousands of dollars in legal fees, bail bond fees, and court costs when he was charged in August 2021 with violating 21 O.S. 644(J) -

FELONY DOMESTIC ASSAULT & BATTERY BY STRANGULATION (Case No. CF-2021-3557) to which he pled guilty after the charge was reduced to a misdemeanor and in December 2022, Mr. Barlean was charged and pled guilty to violating 21 O.S. 644 - MISDEMEANOR DOMESTIC ASSAULT & BATTERY (Case No. CM-2022-4468).

68.     Mr. Barlean now has a reputation for being a burglar, embezzler and inaccurate wife shooter and his former friends and associates avoid him and/or fear him. He is *persona non grata* in Republican Party circles due to the Defendant Officers maliciously stigmatizing him by implicating that he committed the crimes of moral turpitude burglary and embezzlement.

69.     Mr. Barlean's drastic change in temperament also severely impacted on his relationship with his children. They no longer have any communication with him. Mr. Barlean's children have not stayed with him in his home or met him at a restaurant since the June 2021 incarceration at OCDC. Mr. Barlean was not invited by his son to attend his commencement at the University of Oklahoma and, the following year, his daughter also did not invite him to her University of Oklahoma graduation.

## COUNT ONE
## FAILURE TO ACCOMMODATE DISABLED INMATES IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. §12132) AND §504 OF THE REHABILITATION ACT (29 U.S.C. §794)
*(Against Winchester, Jail Trust and Turn Key)*

70.     Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 69 above.

71.     Mr. Barlean was housed in Maximum-Security Gang Pod which does not

allow inmates to use CPAPs.

72.     Turn Key and Winchester violated 42 U.S.C. § 12132 as they acted by reason of Mr. Barlean's breathing disability when they refused to provide him with reasonable accommodation (i.e., CPAP) and transfer to medical housing to put him on par with the other inmates without a breathing disability.

73.     Mr. Barlean is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(1) & (2) and 20 C.F.R. § 35.104.

74.     The Jail Trust is a public entity within the meaning of 42 U.S.C. § 12131(1)(A) and 20 C.F.R. § 35.104.

75.     On July 13, 1999, Mr. Barlean had a sleep study performed that concluded that he demonstrated a "very severe pattern of obstructive sleep apnea." (EXHIBIT F).

76.     29 C.F.R. § 1630.2 includes breathing as a major life activity.  The Seventh Circuit also acknowledged in a § 1983 case, that "sleep apnea can result in death." Orlowski v. Milwaukee County, 872 F.3d 417, 423 (4th Cir. 2017).

77.     Without a CPAP, Mr. Barlean is also unable to participate in other OCDC programs or activities like the non-disabled inmates due to excessive fatigue.

78.     When Mr. Barlean does not use a CPAP, he cannot sleep because his sleep apnea causes him to stop breathing and have shortness of breath.  This leaves him continually exhausted, stressed, experiencing shortness of breath, fearing for his life and suffers unacceptably high blood pressure, pain and discomfort, and said breathing problems substantially limit the operation of Mr. Barlean's respiratory functions and

prevents him from accessing sleep.

79.     Turn Key and the Jail Trust are vicariously liable to Mr. Barlean under the doctrine of *Respondeat Superior* for Winchester's refusal to provide him a CPAP and transferring him to medical housing.

80.     Turn Key failed to undertake a fact-specific investigation to determine what constitutes reasonable accommodation for Mr. Barlean and other inmates with severe obstructive sleep apnea.  Turn Key deliberately stopped the continuous treatment of his sleep apnea by medical professionals since 1999 by refusing to issue him a CPAP.

81.     WHEREFORE, Mr. Barlean prays the Court enter judgment for compensatory and punitive damages against the Jail Trust, Turn Key, and Winchester, and, in addition thereto, the award of attorney's fees and court costs pursuant to 42 U.S.C. §12205 and demands a trial by jury on all issues so triable.

COUNT TWO
FOR DECLARATORY/INJUNCTIVE RELIEF ENJOINING
PERFORMANCE OF UNCONSTITUTIONAL CONTRACT BETWEEN JAIL TRUST
AND TURN KEY IN VIOLATION OF THE EIGHTH AND FOURTEENTH
AMENDMENTS
*(Against Jail Trust and Turn Key)*

82.     Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 81 above.

83.     Mr. Barlean and other inmates with severe sleep apnea were not provided with CPAPs by Turn Key during his stay in June 2021.

84.      Current inmates are not being provided with CPAPs by Turn Key.

FIRST AMENDED COMPLAINT - Page 16 of 54

85.     Future inmates will not be provided with CPAPs by Turn Key under the

current contract with the Jail Trust.  (EXHIBIT G).

86.     The contract calls for Turn Key to honor their constitutional duty to the

inmates before corporate profits in Paragraph 1.3 titled COMPLIANCE WITH

APPLICABLE LAW:

> "The Contractor shall comply with applicable standards and laws set forth
> by the United States Constitution, federal law, and the laws of the state of
> Oklahoma, as well as the standards set by the United States Department of
> Justice, for the duration of this Agreement with the Agency."

87.     The contract is indisputably unconstitutional.  Paragraph 1.8 SPECIALTY

SERVICES last sentence reads:

> "The Contractor shall not be responsible for the provision of eyeglasses,
> contact lenses, hearing aids, hearing aid supplies or any other prosthetic
> devices."

88.     The U.S. Supreme Court recognized in Estelle v. Gamble, 429 U.S. 97, 103

(1976), that "An inmate must rely on prison authorities to treat his medical needs; if the

authorities fail to do so, those needs will not be met."  Considering this, the Court held

that the State has a constitutional obligation, under the Eighth Amendment, to provide

adequate medical care to those whom it has incarcerated." Id. at 104.

89.     The most frequently used treatment for severe sleep apnea like Mr.

Barlean's is a prescribed course of respiratory therapy employing a machine commonly

known as a nasal CPAP (continuous positive airway pressure).  A CPAP is a prosthetic

device is employed consisting of an airflow generator, a flexible hose and a nasal mask

(or pillows) in which air is pumped into the lungs through the nose or nose and mouth during spontaneous breathing.

90.   The U.S. the Supreme Court held, as it has before, that the Eighth Amendment protects against future harm to inmates, noting that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." Helling v. McKinley, 509 U.S. 25, 33 (1993).

91.   Denying a CPAP to an inmate with severe sleep apnea constitutes cruel and unusual punishment under the Eighth Amendment by causing them to risk stroke or death whenever they sleep without one.

92.   WHEREFORE, Plaintiff prays this Honorable Court:

A.   Issue a Declaratory Judgment that the the contract between the Jail Trust and Turn Key is unconstitutionally violative of inmates' rights under the Eighth and Fourteenth Amendments and the Americans with Disabilities Act by denying the procurement of breathing prosthetic devices (CPAPs) for inmates with severe obstructive sleep apnea.

B.   Enter a permanent injunction directing that: (a) Turn Key and the Jail Trust formulate and implement an CPAP policy that meets the prevailing standard of care, including identifying inmates with severe sleep apnea; (b) providing such inmates with CPAPs in a timely manner; and (c) any further appropriate injunctions to prevent the future deprivation of the rights of Plaintiff, current inmates, and future inmates.

C.      Award Plaintiff nominal damages;

D.      Award Plaintiff costs, including reasonable attorneys' fees under 29

U.S.C. §794a and other relevant provisions of law; and

E.      Allow other and further relief to which Plaintiff may be entitled.

COUNT THREE
DEPRIVATION OF CIVIL RIGHTS
BY FALSE ARREST/UNREASONABLE SEIZURE
UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

93.     Plaintiff hereby realleges and incorporates by reference the allegations
contained in paragraphs 1 through 92 above.

94.     Defendant Officers violated Mr. Barlean's well-established right to not be
arrested without a warrant in his home or its curtilage or an exception to the warrant
requirement. Payton v. New York, 445 U.S. 573, 586 (1980).

95.     The Officer Defendants initially seized Mr. Barlean and violated his right to
privacy while he was inside his home behind a locked door where nobody could touch or
hear him talking into his cell phone by aggressively knocking on the glass door and
commanding him to step outside. Mr. Barlean complied and was then placed under arrest
when he was handcuffed and placed in the back seat of a patrol car.

96.     Despite observing through the locked glass door that Mr. Barlean was
alone, unarmed, in gym clothes and waving, inviting them to come inside his home, the
Officer Defendants arrested Mr. Barlean without probable cause that he was engaging in
criminal activity in their presence or that he did so earlier that evening.

FIRST AMENDED COMPLAINT - Page 19 of 54

97.     "In Contrast, when the officers had no reason to believe the suspects were

or could be armed and the suspects were otherwise calm and compliant, we have

generally concluded that the officers' conduct amounted to an arrest." United States v.

Soza, 686 F. App'x 564, 568 (10th Cir. 2017).  The Tenth Circuit in Soza v. Demsich, 13

F.4th 1094 (10th Cir. 2021), held: "It is unconstitutional to use forceful measures in Terry

stop context "absent probable cause or an articulable basis to suspect a threat to officer

safety combined with reasonable suspicion." Manzanares v. Higdon, 575 F.3d 1135,

1150 (10th Cir. 2009) (emphasis in original).

98.     Defendant Officers knew or should have known the parties' criminal

histories when calculating the proper force posture to be in when arriving at Mr.

Barlean's home. "But in conjunction with other factors, criminal history contributes

powerfully to the reasonable suspicion calculus." U.S. v. Simpson, 609 F.3d 1140, 1147

(10th Cir. 2010).

99.     Governing precedent holds "Police are entitled to base probable cause for

an arrest on a citizen complaint, whether of a purported victim (as here) or a non-victim

witness, without investigating the truthfulness of the complaint, unless — this turns out to

be an important qualification — they have reason to believe it's fishy." Guzell v. Hiller,

223 F.3d 518, 519-20 (7th Cir. 2000).

100.    Ms. Minor gave several alcohol-fueled, conflicting, and physically

impossible versions of events that evening, which would lead a reasonable police officer

to conclude there was something "fishy" afoot.

101.    Jacobson, under the Collective Knowledge Doctrine, expressed to Mr. Barlean the analysis of the totality of the evidence in their possession a half-hour before Childers arrived when he told Mr. Barlean that Ms. Minor's stories did not "add up" or were not "making any sense" and that he did not think anyone was going to jail.

102.    Childers arrived with no additional evidence to add to their collective knowledge, yet the Defendant Officers suddenly determined they had probable cause to conduct a warrantless search of Mr. Barlean's home, arrest him without a warrant and seize and confiscate his firearms without a warrant.

103.    No reasonable police officer would not be justified in concluding that Mr. Barlean was violating the law, armed, posing a threat to anyone or was a risk to flee or destroy evidence.  Officer Defendants had no particularized and objective basis for suspecting any legal wrongdoing by him or if he was a threat to officer safety.  United States v. Arvizu, 534 U.S. 266, 273 (2002).

104.    No reasonable police officer would have believed that probable cause existed for the immediate arrest of Mr. Barlean June 7, 2021.  This is corroborated by the facts that Mr. Barlean was not transported to OCDC until after he asked Childers if he could even do one pull-up and that the Oklahoma County District Attorney (hereinafter "DA") declined to file charges.

105.    No reasonable police officer would give credibility to a putative victim who had the opportunity to call the police for help from a safe place and chose to instead hunt down her purported abuser.

106.    Ms. Minor retreated from the bathroom to obtain a pistol. She admitted to

Garcia that she had her cell phone with her in the bedroom and that she could have called

the police before the accidental discharge but chose not to do so because she was in a

hurry. (WILLIS REPORT PAGE 3).

107.    As Lee was transporting Ms. Minor to OCDC, Willis documented in his

report, "Cynthia later told Officer Lee #2020 that she believed the pistol's safety was on

because she attempted to pull the trigger." (WILLIS REPORT PAGE 2). Garcia

intentionally or recklessly omitted the facts from this and the previous paragraph from

her Probable Cause Affidavit to justify Mr. Barlean's warrantless arrest. (EXHIBIT H).

108.    Any layperson would know that each of the above facts were material to

making a probable cause determination and that any reasonable judge would want to

know and see said facts in a Probable Cause Affidavit before making a decision that

would profoundly and forever negatively impact the life of an American citizen.

109.    In Mr. Barlean's Probable Cause Affidavit, Garcia only used facts from Ms.

Minor and the illegal search of Mr. Barlean's home. The were no exculpatory paragraphs

in his affidavit of probable cause for a judge to weigh any competing evidence to make a

finding of probable cause. It was an affidavit for a rubber stamp.

110.    Garcia found Mr. Barlean to be a putative victim without a fishy story or

grudge against Ms. Minor and concluded she had probable cause to make a warrantless

arrest of Ms. Minor based only upon Mr. Barlean's credible statement.

111.    Garcia knew that Ms. Minor was jilted and evicted by Mr. Barlean, and that

there was a significant chance she bore a grudge against him would have made it unreasonable - and therefore unconstitutional - to arrest him on Ms. Minor's mere say-so.

112.    Garcia personally observed Ms. Minor's lack of candor, signs of intoxication, and other indicia of questionable reliability.  Garcia incurred a constitutional duty to further investigate.  Hebron v. Touhy, 18 F.3d 421, 423 (7th Cir. 1994).

113.    Defendant Officers are liable for violating Mr. Barlean's constitutional rights because they were integral participants in the violations.  Blankenhorn v. City of Orange, 485 F.3d 463, 481 n. 12 (9th Cir. 2007).

114.    As a direct and proximate result of the unlawful seizure, arrest, and detention of Mr. Barlean, he was deprived of his civil rights as guaranteed to him by the Fourth Amendment of the U.S. Constitution, and suffered humiliation, degradation, apprehension for his bodily security, physical injuries, pain and suffering and other mental and emotional harms, which continue to this day and are likely to continue.

115.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees (Plaintiff is aware that as a Pro Se attorney he is not entitled to an attorney fee but he may retain counsel during the course of this litigation) and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all triable issues.

COUNT FOUR
DEPRIVATION OF CIVIL RIGHTS
BY EXCESSIVE FORCE/PROLONGED DETENTION
UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

116.    Plaintiff hereby realleges and incorporates by reference the above allegations contained in paragraphs 1 through 115 above.

117.    Mr. Barlean for ninety minutes was handcuffed with his arms in back in the back of a patrol car, lying face down on his driveway or sitting on a curb in front of a neighbor's house the with the whole time being told by the Officer Defendants that he was not under arrest and that he was only being detained.

118.    Jacobsen responded to one of Mr. Barlean's protests by saying, "I know you used to live in Colorado. I've never lived in the state of Colorado. I don't know exactly what their forte is with detainment and arrest..." before Mr. Barlean cut him off saying, "It's federal law, has nothing to do with the state law." (VIDEO FILE JACOBSEN #1 @ 19:20).

119.    Mr. Barlean spent his last half hour in handcuffs getting a "Rough Ride" to OCDC in the backseat of a Solis' patrol car (hands cuffed behind back, and seat belt was purposefully not used).  A "Rough Ride" is not rationally related to any legitimate governmental objective.  Kingsley v. Hendrickson, 576 U.S. 389, 396-397 (2015).

120.    No reasonable police officer in the same circumstances could have concluded that Mr. Barlean needed to be immediately seized with handcuffs and secured in the back seat of a patrol car after seeing through the glass door that he was not a threat to anyone or and was not a risk for flight or evidence destruction.

121.    The application of handcuffs on Mr. Barlean and his prolonged detention

was excessive, unnecessary force applied to him and constituted a violation of his established right to be free of excessive force under the Fourth Amendment.

122.    Mr. Barlean believes the only reason he remained handcuffed for two hours was because he was being physically punished by the Officer Defendants for pointing out their professional shortcomings. The Kingsley court held that pretrial detainees like him cannot be punished at all, much less "maliciously and sadistically." Id. At 401.

123.    Officer Defendants did not temper or limit the amount of force they used, nor did Mr. Barlean present a security problem or threat reasonably perceived by the Officer Defendants as he was not actively resisting. Id. at 397.

124.    Keeping Mr. Barlean in handcuffs for two hours (with and hour a half after the investigation concluded) is a governmental action and is not rationally related to a legitimate government purpose. Id. at 398.

125.    As a direct and proximate result of the excessive force used to effectuate the unlawful seizure, arrest, and prolonged detention of Mr. Barlean, he suffered humiliation, degradation, physical injuries, pain and suffering and other mental and emotional harms, which continue to this day and are likely to continue.

126.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT FIVE
DEPRIVATION OF CIVIL RIGHTS
BY RETALIATION AGAINST FREEDOM OF SPEECH
UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

127.    Plaintiff hereby realleges and incorporates by reference the above allegations contained in paragraphs 1 through 126 above.

128.    Officer Defendants retaliated against Mr. Barlean for exercising his First Amendment right to educate them of their professional shortcomings by arresting him without probable cause or warrant, by searching his home without a warrant, consent, or presence of exigent circumstances and painfully prolonged his detention in handcuffs for no investigatory reason for an hour after the investigation concluded.

129.    When Childers arrived, he asked Mr. Barlean to tell him what happened that evening. Mr. Barlean refused and proceeded to tell Childers how he almost got his officers killed because he failed to properly train them on officer safety procedures.

130.    When Mr. Barlean was seized, the Officer Defendants could see two loaded handguns on a table by the door through the glass door, yet they failed to secure the weapons and conduct a protective sweep at the time of Mr. Barlean's arrest.

131.    Mr. Barlean also chastised Childers for not teaching his officers the fundamentals of search and seizure law and for not leading by example and asking Childers if he could even do a single pull-up. Childers then conferred with Lee, and they searched Mr. Barlean's home without a warrant. (WILLIS REPORT PAGE 4). After the search, Childers ordered Mr. Barlean transported to OCDC for undisclosed charges.

132.    The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers including speech that is disputatious, emotionally charged or profane. City of Houston, Tex. V. Hill, 482 U.S. 451, 461 (1987).

133.    Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under §1983. White v. Napoleon, 897 F.2d 103, 111-112 (3d Cir. 1990). But for Mr. Barlean's exercising his protected Free Speech rights, Childers would not have retaliated by punishing him.

134.    Childers' retaliatory actions were sufficient to deter a person of ordinary firmness from exercising their constitutional right to free speech to criticize and question the conduct of police should they ever show up and immediately put that person in handcuffs with no explanation or even asking them their name.

135.    Defendant Officers cannot show that the home search and Mr. Barlean's arrest would have been initiated without respect to retaliation. See, Nieves v. Bartlett, 139 S.Ct. 1715, 1725 (2019).

136.    If Mr. Barlean had remained silent all evening, he would not have been transported to OCDC. "So there can be little doubt that 'being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future.'" Clary v. City of Cape Girardeau, 165 F.Supp.3d 808, 826 (E.D. Mo. 2016).

137.    The temporal proximity between the protected conduct and the retaliation may be probative of causation. See, Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003). The warrantless search of Mr. Barlean's home, his warrantless arrest and

the warrantless seizure of his firearms occurred within minutes of Mr. Barlean asking

Childers if he could do even one pull-up.

138.    As a direct and proximate result of the misconduct of the Officer

Defendants expressed in this Count, Mr. Barlean was deprived of his civil rights as

guaranteed by the First and Fourth Amendments of the U.S. Constitution and suffered

loss of liberty, loss of property, humiliation, degradation, apprehension for his bodily

security, physical pain and suffering and other mental and emotional harms, which

continue to this day and are likely to continue.

139.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive

damages against Defendant Officers, and in addition thereto, demands the award of

attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

trial by jury on all issues so triable.

COUNT SIX
DEPRIVATION OF CIVIL RIGHTS
BY CIVIL CONSPIRACY AT MR. BARLEAN'S HOME
UNDER 42 U.S.C. § 1983
*(Against Officer Defendants)*

140.    Plaintiff hereby realleges and incorporates by reference the allegations

contained in paragraphs 1 through 139 above.

141.    Lee and Childers hatched a plan to frame Mr. Barlean for Assault with a

Deadly Weapon to punish Mr. Barlean for telling them they needed remedial training.

142.    Lee, Childers, and Garcia, while acting under color of law, entered into an

agreement to violate Mr. Barlean's well-established rights under the Fourth Amendment

to be free from unreasonable searches and seizures. Willis, Solis, Jacobsen and, unknown at this time, police officers John and/or Jane and Doe 1-12 met shortly thereafter with Childers and joined the conspiracy to punish Mr. Barlean by framing him with a felony and causing his detention at OCDC and prosecution.

143.   Lee, Childers, and Garcia, in furtherance of the conspiracy, took the overt steps of searching Mr. Barlean's home, confiscating his firearms and writing bogus Probable Cause Affidavits and Incident Reports.

144.   Lee put in his report that they decided to enter and search Mr. Barlean's home for guns and take them to the police station for safekeeping.

145.   Jacobsen and Solis also agreed to the conspiracy and took the overt steps of helping load the seized guns in the trunks of the patrol vehicles. Discovery will reveal if they also unlawfully entered Mr. Barlean's home.

146.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, acted other than in the normal course of their corporate duties, with reckless indifference to the rights of others, and in total disregard for the truth and Mr. Barlean's clear innocence.

147.   Mr. Barlean pleads a conspiracy count in this matter to extend liability to all the Defendant Officers acting in concert to violate his rights even though they did not individually perform all the acts charged in this complaint. "A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act." Hale v.

Townley, 45 F.3d 914, 920 (5th Cir. 1995).

148.    As a result of Defendant's misconduct described in this count, Mr. Barlean

suffered loss of liberty, loss of property, great mental anguish, humiliation, degradation,

emotional pain and suffering, and other grievous and continuing damages and injuries.

149.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive

damages against Defendant Officers, and in addition thereto, demands the award of

attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

trial by jury on all issues so triable.

COUNT SEVEN
DEPRIVATION OF CIVIL RIGHTS
BY FAILURE TO INTERVENE
UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

150.    Plaintiff hereby realleges and incorporates by reference the allegations

contained in paragraphs 1 through 149 above.

151.    During the constitutional violations described herein, including but not

limited to Mr. Barlean's arrest without probable cause, prolonged detention in handcuffs

without probable cause, search of home without a warrant and seizure of his firearms

without a warrant, one or more of the Defendant Officers stood by without intervening to

prevent the violation of Mr. Barlean's constitutional rights, even though they had the

realistic opportunity to do so.

152.    The misconduct described in this count was objectively unreasonable and

was undertaken intentionally, with malice, with reckless indifference to the rights of

others, and in total disregard for the truth and Mr. Barlean's clear innocence.

153.    The duty to intervene in this situation would have been apparent to any objectively reasonable law enforcement officer. Hope v. Pelzer, 536 U.S. 730, 741 (2002). The Tenth Circuit has recognized "that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008).

154.    As a result of the Officer Defendants failure to intervene to prevent violations of his constitutional rights, Mr. Barlean suffered loss of liberty, property, physical injuries, great pain and suffering, mental anguish, humiliation, degradation, emotional pain, suffering, and other grievous and continuing damages and injuries.

155.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT EIGHT
DEPRIVATION OF CIVIL RIGHTS
BY INVASION OF PRIVACY/UNREASONABLE WARRANTLESS SEARCH OF
MR. BARLEAN'S HOME UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

156.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 155 above.

157.    Defendant Officers, searching his home without a warrant violated Mr.

FIRST AMENDED COMPLAINT - Page 31 of 54

Barlean's right to privacy under the Fourth Amendment which is enforceable against the States through the Due Process Clause of the Fourteenth Amendment. "The security of one's privacy against arbitrary intrusion by the police - which is at the core of the Fourth Amendment — is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27 (1949).

158.    The Officer Defendants had over an hour and a half to procure a warrant to search Mr. Barlean's home before they transported him to OCDC.

159.    Because Defendant Officers were not lawfully in Mr. Barlean's home, they were legally estopped from making any video recordings or still photographs to memorialize what they saw during the execution of their search or what they wrongfully considered a crime scene. Furthermore, Garcia's BWC also shows her outrageously using her own cell phone camera. (VIDEO FILE RAY #3 @ 2:53).

160.    Defendant Officers' video recordings constituted a search under the Fourteenth Amendment because they were unlawfully inside Mr. Barlean's home. There will be additional, future searches/invasions of his privacy whenever the BWC footage, a public record, is released pursuant to the Open Records Act revealing, to all requestors, a highly detailed profile of his military service, political associations, religious views, and romantic life. See, Commonwealth v. Yousuf, 488 Mass. 379 (Mass. 2021).

161.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard for the truth and Mr. Barlean's clear innocence.

162.    Malice may be inferred from the Defendant Officers' willful disregard of

OCPD Operations Manual § 188.0 <u>Body Worn Cameras</u>.  Specifically, the first two subsections of § 188.32 state that an officer shall not activate or shall deactivate their body-worn camera:

1.   When knowingly interviewing victims, witnesses, involved parties or reporting parties;

2.   In any situation where individuals have a reasonable expectation of privacy, such as their residence, a bathroom or locker room;

163.   As a result of Defendant Officers' misconduct, Mr. Barlean suffered loss of liberty, loss of property, great mental anguish, humiliation, degradation, emotional and physical pain and suffering, and other grievous and continuing damages and injuries.

164.   WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT NINE
DEPRIVATION OF CIVIL RIGHTS
BY UNREASONABLY SEIZING MR. BARLEAN'S FIREARMS
UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

165.   Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 164 above.

166.   By confiscating Mr. Barlean's guns not involved in the incident, Defendant Officers knowingly violated 22 OK Stat § 22-60.8A (2021) which states that only guns used in a domestic incident shall be seized by the police.

FIRST AMENDED COMPLAINT - Page 33 of 54

167. Defendant Officers also intentionally violated the OCPD Operations

Manual, § *254.30* Securing Weapons:

> "Officers may take temporary custody of any weapon or instrument at the
> scene of a domestic violence incident for safety reasons. If the weapon was
> not involved in any apparent criminal offense, and once the crime scene is
> secured and there is no immediate danger to any individual involving a
> threat to human life or physical assault, any temporarily seized weapon or
> instrument shall be returned to the owner or remain at the scene."

168. Mr. Barlean had a well-established constitutional right to not have his

firearms unreasonably seized under the Fourth Amendment. The U.S. Supreme Court in

Caniglia v. Strom, 141 S. Ct. 1596 (2021), held that guns may not be taken from a home

without a warrant for safekeeping under the community caretaking doctrine which was

originally designed for searches of vehicles already under police control. The Officer

Defendants used "safekeeping" as a pretext to punish Mr. Barlean by confiscating his

firearms and forcing him to go through administrative hardship to get them returned from

the OCPD Property Room and to go on a fishing expedition in his home.

169. The misconduct described in this Count was objectively unreasonable and

was undertaken intentionally, with malice, with reckless indifference to the rights of

others, served no investigatory purpose and without probable cause or statutory authority.

170. As a result of Defendant Officers' unlawful seizure of his guns, Mr.

Barlean suffered loss of liberty, loss of property, great mental anguish, humiliation,

degradation, emotional and physical pain and suffering, and other grievous and

continuing damages and injuries.

171.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT TEN
DEPRIVATION OF CIVIL RIGHTS
BY VIOLATING MR. BARLEAN'S SECOND AMENDMENT
RIGHT TO POSSESS A HANDGUN IN HIS HOME
UNDER 42 U.S.C. § 1983
*(Against Childers, Solis, Garcia, Jacobsen, Lee)*

172.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 171 above.

173.    The false arrest of Mr. Barlean by Officer Defendants was the direct and proximate cause of the loss of his well-established right to self-defense by having a handgun in his home.

174.    Mr. Barlean had a valid concealed handgun license issued by the Oklahoma State Bureau of Investigation (hereinafter "OSBI").

175.    The U.S. Supreme Court in District of Columbia v. Heller, 554 U.S. 570, 589 (2008) clearly established that the Second Amendment allows a person to keep a handgun in one's home and it applies to the states through the Fourteenth Amendment.

176.    21 OK Stat § 21-1290.17 (2021) required the OSBI to immediately suspend Mr. Barlean's handgun license for concealed carry when he was arrested.

177.    When Mr. Barlean was released from OCDC, he called OSBI to check the

status of his handgun license and discovered it was suspended.

178.    Mr. Barlean was unable to exercise his Second Amendment right to self-defense for a month and a half until he was able to obtain a letter from the DA, under raised seal, stating the DA declined to file any charges against him and gave it to OSBI so they could lift the handgun license suspension.  (EXHIBIT I).

179.    Mr. Barlean is a Recreational Vehicle enthusiast. He had plans to take some friends for a road trip staying at various RV parks/campgrounds.  To protect his family, friends and himself, Mr. Barlean possesses a concealed handgun license to be able to legally drive across state lines while carrying a concealed .45 in a shoulder holster to defend against a carjacking or robbery.

180.    Mr. Barlean only drives though and stays in states that honor his Oklahoma gun permit. Once at a campground, he hooks up the utilities to the RV and employs a jack and blocks to level the now immobile motor home.  Mr. Barlean carries a concealed .45 pistol when in and outside of the RV at an RV park to guard against a home invasion.

181.    Mr. Barlean was forced to cancel his vacation plans after learning OSBI suspended his concealed carry handgun license.  Mr. Barlean had no choice as he did not want to risk committing a felony in a sister state by violating their concealed carry laws.

182.    Officer Defendants' false arrest of Mr. Barlean was the proximate cause of OSBI suspending his handgun license and losing his constitutional right under Heller to possess a handgun in his motorhome while it is immobilized at a RV park in a sister state.

183.    As a direct and proximate result of Plaintiff's false arrest, Mr. Barlean was

deprived of his rights guaranteed by the Second and Fourteenth Amendments and suffered loss of liberty, loss of property, humiliation, degradation, apprehension for his bodily security, other mental and emotional harms, and hedonic damages.

184.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Defendant Officers, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT ELEVEN
DEPRIVATION OF CIVIL RIGHTS
BY MALICIOUS PROSECUTION
UNDER 42 U.S.C. § 1983
*(Against Defendant Officers)*

185.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 184 above.

186.    Defendant Officers, individually, jointly, an in conspiracy with one another, as well as under color of law and within their scope of employment, deprived Mr. Barlean of his well-established constitutional right to be free of unreasonable seizures of the person and malicious prosecutions recognized by the Tenth Circuit in Bledsoe v. Carreno, 53 F.4th 589 (10th Cir. 2022).

187.    Defendant Officers falsely accused Mr. Barlean of committing a violent felony offense and exerted their influence to cause his continued confinement in OCDC without any probable cause in violation of his rights guaranteed under the Fourth Amendment and the procedural and substantive due process components of the

Fourteenth Amendment.

188.    Defendant Officers arrested Mr. Barlean without probable cause because he hurt Childers' feelings.  Defendant Officers caused Mr. Barlean to be confined in OCDC for two days before he received a probable cause hearing.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Mr. Barlean's favor with no charges being filed against him by the DA.  Thompson v. Clark, 142 S. Ct. 1332, 1341 (2022).

189.    Lead investigator Willis generated an Incident Report crafted to get the DA to prosecute Mr. Barlean.  The report contained a synopsis of the reports of the other police officers, a criminal history of the parties and supposedly all the BWC footage from all the officers responding to Mr. Barlean's home.

190.    Willis' scienter of maliciously framing Mr. Barlean is evidenced by his: (1) purposefully fabricating and inserting the crimes of burglary and embezzlement into Mr. Barlean's Criminal History, (2) for the material omission from his report the synopsis of Jacobsen's BWC footage showing him telling Mr. Barlean that Ms. Minor's stories were not adding up, they don't make sense and that nobody would be going to jail, and (3) for the material omissions from his report of Ms. Minor's previous assault conviction for trying to shoot her boyfriend and that she was driving on a suspended driver's license.

191.    The misconduct of the Officer Defendants described in this Count was objectively unreasonable, was undertaken intentionally, without probable cause, with malice, with reckless indifference to the rights of others, and in total disregard of the truth

and Mr. Barlean's clear innocence.

192.   As a result of the misconduct of the Defendant Officers, described in this

Count, Mr. Barlean suffered loss of liberty, loss of property, physical pain and suffering,

great mental anguish, humiliation, degradation, emotional pain and suffering, and other

grievous and continuing injuries and damages.

193.   WHEREFORE, Plaintiff demands judgment for compensatory and punitive

damages against Defendant Officers, and in addition thereto, demands the award of

attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a

trial by jury on all issues so triable.

COUNT TWELVE
DEPRIVATION OF CIVIL RIGHTS
BY DEPRIVING MR. BARLEAN'S LIBERTY INTEREST IN HIS GOOD NAME
AND REPUTATION/RIGHT TO CANDIDACY/DEFAMATION BY IMPLICATION
AND STIGMA-PLUS
UNDER 42 U.S.C. § 1983
(*Against Willis)*

194.   Plaintiff hereby realleges and incorporates by reference the allegations

contained in paragraphs 1 through 193 above.

195.   Defendant Officers, while acting individually, jointly and in conspiracy

with one another, as well as under color of law and within the scope of their employment,

deprived Mr. Barlean of his protected liberty interest in his good name and reputation

under the Due Process Clause of the Fourteenth Amendment and his rights under the First

Amendment by implying that Mr. Barlean was convicted of the moral turpitude crimes of

burglary and embezzlement in a published police report that is now a public record.

196.    Willis made a bogus incident report crafted to get the DA to prosecute Mr. Barlean. His report branded Mr. Barlean an embezzler, which effectively stripped him of his right under the First Amendment to be a candidate for public office ever again. Being labeled an embezzler is a stigma than can never be removed in party politics.

197.    Any reasonable person would read the Criminal History section of Willis' report and reasonably infer that Mr. Barlean was a "convicted burglar" and a "convicted embezzler" and would not want that person controlling the public's finances.

198.    Willis has forced Mr. Barlean to abandon his liberty interest in self-identifying as a law-and-order Republican. To continue a career in politics, he would have to affiliate with a different political party and become a Social Justice Warrior.

199.    Defendant Officers subjected Mr. Barlean to arbitrary governmental action that shocked the conscience. Because Mr. Barlean hurt Childers' feelings, Childers punished Mr. Barlean by trampling on the U.S. Constitution ordering the illegal search of Mr. Barlean's home, his illegal arrest, the illegal confiscation of his firearms, his Rough Ride to OCDC, and his continued punishment inside OCDC.

200.    Willis' acts shocked judicial conscience by intentionally submitting an incident report that was *per se* defamatory that he hoped he could convince the DA to prosecute Mr. Barlean and knowing that the report was going to be a public record. His report is an unprivileged executive communication – only judicial and legislative reports are fully privileged. His report is now a public record as he knew it would be.

201.    Willis and his coconspirators were maliciously punishing Mr. Barlean.

They knew that Mr. Barlean was innocent, Mrs. Minor was not a credible witness, and filed incident reports written in a manner to ensure Mr. Barlean stayed incarcerated for a long time. "Actual malice may be found when a publisher had a "subjective awareness of probable falsity." Gertz v. Robert Welch, Inc. 418 U.S. 323 at 334 n.6 (1974).

202.   Defendant Officers, while acting under color of law, intentionally and/or recklessly abridged Mr. Barlean's well-established First Amendment rights of association, individual expression, self-determination, right to be a candidate and right to participate effectively in the electoral process by taking away his right to vote for himself. "Consequently, we hold that candidacy is both a protected First Amendment right and a fundamental interest." Mancuso v. Taft, 476 F.2d 187, 196 (1st Cir. 1973).

203.   As a result of the misconduct of Defendant Officers described in this Count, their actions constituted libel *per se* and defamation by implication and stigma-plus causing Mr. Barlean to suffer loss of liberty, property, business and political opportunities, and great mental anguish, humiliation, degradation, emotional and physical pain and suffering, and other grievous and continuing injuries and damages.

204.   WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Officer Defendants, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT THIRTEEN
DEPRIVATION OF CIVIL RIGHTS
BY CIVIL CONSPIRACY AT JAIL

UNDER 42 U.S.C. § 1983
(*Against Solis, Childers, Roe, Pettit and Does 1-12*)

205.    Plaintiff hereby realleges and incorporates by reference the allegations
contained in paragraphs 1 through 204 above.

206.    When Mr. Barlean was being booked into OCDC, he could not remove his
USAFA ring from his swollen finger.  He asked Roe for some soap to help remove the
ring.  He then observed Solis lean over and whisper in Roe's ear.  Solis then left the room
and returned a couple of minutes later holding his cell phone and again whispered into
Roe's ear.  Roe then told Mr. Barlean to leave it on and ordered him to walk through the
metal detector (which sounded an alarm) and enter the secure area.

207.    Mr. Barlean believes that Solis called Childers and they formed a
conspiracy to keep punishing him as a pretrial detainee in OCDC and, in furtherance of it,
solicited Roe to join the conspiracy to give him the best OCDC experience possible.

208.    Roe joined the conspiracy, and in furtherance of it, ordered Mr. Barlean to
wear his USAFA ring into the jail.  This affirmative act of Roe had no legitimate
governmental purpose and the Court may infer that his conduct was malicious and
conscience shocking because, as an experienced booking officer, he intentionally violated
57 OK Stat § 57-21 (2021) by forcing him to smuggle gold – a felony offense.

209.    Pettit, in furtherance of conspiracy, made false entries on the intake exam
forms that the Classification Officer uses, in part, to determine where inmates are housed
and what security level is appropriate for them.  Pettit falsely documented:

A.    Have you ever committed a violent offense?  **YES.**

B.    Is the inmate's criminal history exclusively non-violent? **NO.**

C.    Does the patient were glasses, contacts, dentures, partial, hearing aids or use canes, crutches or any prosthesis or medical devices?  **NO.**

D.    Disposition/Plan of Action – **Stable MH Condition GENERAL POPULATION** (EXHIBIT J).

210.    John Doe #1 is the Classification Officer who joined the conspiracy to continue punishing Mr. Barlean and aided in its execution by classifying Mr. Barlean as an unaffiliated gang member and housing him in the Maximum-Security gang Pod.

211.    Several weeks later, when Mr. Barlean was arrested on a different matter and was booked into OCDC on August 18, 2021, that Classification Officer sent Mr. Barlean to the Medical Floor based on that intake nurse's notation on her Classification Communication/Relocation Form – **Special needs – MEDICAL HOUSING – CPAP WHILE SLEEPING.**  (EXHIBIT K).

212.    John Doe #2 joined the conspiracy to continue punishing Mr. Barlean and, in furtherance, told the other inmates that Mr. Barlean was a former prosecutor and was paid to put people in jail.

213.    Mr. Barlean believes more guards and/or medical staff were participants in the conspiracy to deprive him of his well-established right as a pretrial detainee to be free of any punishment and unsafe living conditions.

214.    Mr. Barlean was continuously exposed to extreme, imminent danger from

the other inmates threatening to harm him for being a former prosecutor and/or seeking to relieve him of his USAFA ring.

215.    The misconduct by all Defendants described in this count was objectively unreasonable and was undertaken intentionally, with malice, acted other than in the normal course of their corporate duties, with reckless indifference to the rights of others, and in total disregard for the truth and Mr. Barlean's clear innocence.

216.    Mr. Barlean pleads a conspiracy count to extend liability to all Defendants acting in concert to violate Mr. Barlean's rights even though they did not individually perform all the acts charged in this complaint.

217.    As a result of the misconduct of Solis, Roe, Pettit, Childers, Doe #1 and Doe #2 described in this count, Mr. Barlean suffered loss of his liberty interest in bodily integrity, cuts, scrapes, lacerations and deep bruising of his arms, elbows, feet, fingers, hands, knees, shins, great physical pain, severe mental anguish, emotional pain and suffering, and other grievous and continuing damages and injuries.

218.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against Solis, Pettit Roe, Childers, Doe #1, and Doe #2, in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT FOURTEEN<br>
DEPRIVATION OF CIVIL RIGHTS<br>
BY DELIBERATE INDIFFERENCE<br>
UNDER 42 U.S.C. § 1983<br>
<em>(Against Turn Key, Winchester, and Jail Trust)</em>

219.   Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 218 above.

220.   Mr. Barlean was a pretrial detainee entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment via the Fourteenth Amendment.  The right to custodial medical care for pretrial detainees like Mr. Barlean is well-settled and that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976).

221.   Mr. Barlean had a sleep study conducted in 1999 and was diagnosed with severe obstructive sleep apnea, prescribed a Continuous Positive Airway Pressure machine ("CPAP") to avoid having a stroke and has since used a CPAP every night of his life until he was incarcerated at OCDC.

222.   On June 8, 2021, around 9 p.m., Mr. Barlean woke up gasping for breath and spasming in his bed. He believed he was starting to have a stroke as he was hyperventilating, experiencing tunnel vision, loud ringing in his ears and experiencing severe fatigue and pain at the same time.  Mr. Barlean called for medical assistance and was taken to the infirmary.

223.   Mr. Barlean explained his symptoms and fear of death from lack of a CPAP to the infirmary nurse.  The nurse told him that they did not issue CPAPs and that he would make an appointment for him to see the Medical Director scheduling the appointment as "Priority 1 High" to see if anything could be done.

224.    Courts have long held that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See* Id. Winchester had actual notice of Mr. Barlean's dire, immediate need for a CPAP after speaking with and examining Mr. Barlean. (EXHIBIT L). Any reasonable physician could tell by Mr. Barlean's shaking, very high blood pressure readings and extreme fatigue that Mr. Barlean was on the verge of a stroke and would immediately procure a CPAP to a patient exhibiting that symptomology. Farmer v. Brennan, 511 U.S. 825, 847 (1994).

225.    The chart notes of Turn Key's nurses reflect that Mr. Barlean had unacceptably high blood pressure every time he was checked during his incarceration.

226.    Winchester denied Mr. Barlean's plea for a CPAP, telling him that Turn Key did not provide CPAPs to inmates.

227.    Winchester observed Mr. Barlean and documented on his Subjective Interview Form that he appeared "shakey [sic] and weak", Mr. Barlean was very alert and oriented, understood the gravity of his medical condition and was able to discuss it with him. The Tenth Circuit Court of Appeals in Self v. Crum, 439 F.3d 1127, 1232 (10th Cir. 2006) held "that a deliberate indifference claim will arise when a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency."

228.    Despite having the professional knowledge and experience to know that severe Obstructive Sleep Apnea is a life-threatening condition, Medical Director

Winchester, as physician, policymaker and gatekeeper to medical equipment, unconstitutionally refused Mr. Barlean's request to be issued a CPAP resulting in the unnecessary and wanton infliction of pain, suffering, and heightening his risk of stroke.

229.    Winchester's refusal to provide Mr. Barlean with a CPAP and his refusal to write a prescription himself for Mr. Barlean to use a CPAP so his former spouse could immediately bring it to OCDC and end his suffering caused the interruption of continuous care by medical professionals since 1999 treating Mr. Barlean's life threatening obstructive sleep apnea without any medical consideration.  The denial to provide Mr. Barlean with a CPAP constitutes reckless conduct by Winchester and Turn Key for intentionally stopping prescribed treatment. Estelle, 429 U.S. at 104-105 (1976).

230.    Winchester's refusal to provide Mr. Barlean with a CPAP constituted deliberate indifference to Mr. Barlean's Fourteenth Amendment rights as a pretrial detainee.  Winchester is liable to Mr. Barlean for deliberate indifference for causing the cessation of a prescribed, continuous course of a medical treatment plan for a life-threatening condition.  Winchester was the official with final policymaking authority and gatekeeper to medical devices who violated Mr. Barlean's right to medical treatment as a pretrial detainee by refusing to provide him with a CPAP.

231.    As a result of the misconduct of Defendants named in this Count, constituted deliberate indifference their actions caused Mr. Barlean to suffer loss of liberty, bodily integrity, great mental anguish, humiliation, degradation, emotional and physical pain and suffering, and other grievous and continuing injuries and damages.

232.     WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages against said Defendants in this Count, and in addition thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all issues so triable.

COUNT FIFTEEN
DEPRIVATION OF CIVIL RIGHTS
BY VIOLATING SUBSTANTIVE DUE PROCESS CLAUSE
OF THE FOURTEENTH AMENDMENT
UNDER 42 U.S.C. § 1983
*(Against Roe)*

233.     Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 232 above.

234.     Booking Officer Roe, acting under color of law, affirmatively acted to create Mr. Barlean's exposure to danger from the other inmates by refusing to give Mr. Barlean soap to remove his USAFA ring from his swollen finger, ordering him to leave the ring on and to proceed through the metal detector fully aware of the harm awaiting.

235.     Roe was also in a special-relationship with Mr. Barlean as his Booking Officer. Mr. Barlean was in the group of pretrial detainees in custody who depended on the state to satisfy basic human needs. At all times material to this count, Roe had assumed control of Mr. Barlean sufficient to trigger an affirmative duty to provide protection to Mr. Barlean from violence from other inmates. Roe failed to protect Mr. Barlean by refusing to follow 57 OK Stat § 57-21 (2021) and by affirmatively ordering Mr. Barlean to enter the jail wearing his USAFA ring.

236.   Roe knew Mr. Barlean would be in danger or failed to exercise professional judgement regarding that danger.  That danger being the substantial risk of severe bodily harm at the hands of the much younger inmates would inflict on him attempting to take his USAFA ring.  Roe violated Mr. Barlean's fundamental liberty interest in being free of punishment as a pretrial detainee and his liberty interest in bodily integrity.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).

237.   There is no case law where a booking officer intentionally defies a felony state statute prohibiting the introduction of contraband into a penal institution by personally ordering a detainee to carry gold/money/precious stones into a jail or prison.

238.   As a direct and proximate result of being forced to wear his USAFA ring into the OCDC, Mr. Barlean sustained physical and emotional injuries defending himself from inmates who took too much interest in his ring.

239.   Roe's conduct shocks the judicial conscience.  Roe's conduct was a deliberate government action that was arbitrary and unrestrained by established principles of private right and distributive justice.

240.   Roe's conduct shocks judicial conscience.  Roe arbitrarily and deliberately abused his authority or employed it as an instrument of oppression against Mr. Barlean for telling the police earlier that they were in serious need of remedial training.  Roe's actions were not related to a legitimate nonpunitive governmental purpose.

241.   As a result of the misconduct of Roe described in this Count, Mr. Barlean suffered loss of liberty, physical harm to his body, great physical pain, severe mental

anguish, emotional pain and suffering, and other continuing injuries and damages.

242.    WHEREFORE, Plaintiff demands judgment for compensatory and punitive

damages against Roe, and in addition thereto, demands the award of attorney's fees and

court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on all

issues so triable.

COUNT SIXTEEN
DEPRIVATION OF CIVIL RIGHTS
BY DANGEROUS CONDITIONS OF CONFINEMENT
UNDER 42 U.S.C. § 1983
(*Against Doe #2*)

243.    Plaintiff hereby realleges and incorporates by reference the above

allegations contained in paragraphs 1 through 242 above.

244.    Mr. Barlean was a pretrial detainee.  Under the Due Process Clause of the

Fourteenth Amendment, Mr. Barlean had a well-established right to not be punished

before an adjudication of guilt in accordance with due process of law.  Bell v. Wolfish,

441 U.S. 520, 535 (1979).

245.    Mr. Barlean had a condition of confinement that had no penological or

governmental purpose that was intentionally imposed by guard Doe #2 to continue his

punishment.  Mr. Barlean watched Doe #2 tell two Universal Aryan Brotherhood gang

members that he was a former prosecutor who got paid to put people in jail.

246.    In Bell at 539, the Court held: "[I]f a restriction or condition is not

reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court

permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."

247.   Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994).  Doe #2 knew or should have known the substantial risk of serious harm associated with identifying an inmate as a former member of the law enforcement community in the Maximum-Security Gang Pod.  After Doe #2 outed Mr. Barlean, he took no steps to reduce or protect Mr. Barlean from substantial risk of serious harm at the hands of retaliating inmates.

248.   Doe #2 was deliberately indifferent to the foreseeable risk of substantial harm to Mr. Barlean by the inmates retaliating against him for being a former prosecutor.

249.   Mr. Barlean's dangerous condition of confinement violated his right under the Fourteenth Amendment to not be punished as a pretrial detainee.  Mr. Barlean suffered punishment at the hands of other inmates while defending himself and suffered severe emotional harm from listening to threats from other inmates of what they going to do to his "prosecutor ass" which exacerbated Mr. Barlean's PTSD and removed the therapeutic gains made in the last ten years.  "Suffering physical assaults while in prison is not part of the penalty that criminal offenders pay for their offenses against society." <u>Benefield v. McDowall</u>, 241 F.3d 1267, 1271 (10th Cir. 2001).

250.   The Tenth Circuit Court of Appeals has long recognized that labeling an inmate a "snitch" or otherwise inciting other inmates to harm an inmate states an Eighth Amendment violation, regardless of whether the inmate is ever actually harmed. <u>Id</u>.

251.   As a result of the misconduct of Doe #2 described in this Count, Mr.

Barlean suffered unrelenting and life-threatening fear, loss of sleep, loss of liberty,

physical harm to his body, great physical pain and suffering, severe mental anguish,

emotional pain and suffering, and other grievous and continuing injuries and damages.

252.   WHEREFORE, Plaintiff demands judgment for compensatory and punitive

damages against Doe #2, and, in addition thereto, demands the award of attorney's fees

and court costs pursuant to 42 U.S.C. §§ 1983 and 1988 and demands a trial by jury on

all issues so triable.

COUNT SEVENTEEN
DEPRIVATION OF CIVIL RIGHTS
BY UNCONSTITUTIONAL GOVERNMENT POLICY
OF NOT PROVIDING PRESCRIBED
MEDICAL PROSTHETIC DEVICES TO INMATES
UNDER 42 U.S.C. § 1983
*(Against Jail Trust and Turn Key)*

253.   Plaintiff hereby realleges and incorporates by reference the above

allegations contained in paragraphs 1 through 252 above.

254.   Turn Key, by virtue of its contractual relationship with the Jail Trust, is a

state agent performing the state act of providing medical care to OCDC inmates under the

color of law for The Jail Trust.  The Contract contains the official governmental policy of

the Jail Trust regarding the provision of CPAPs to inmates with severe obstructive sleep

apnea.  This policy was the moving force behind the deprivation of Mr. Barlean's rights.

255.   Turn Key, under the Contract, shares with the Jail Trust the same

governmental policy of not providing CPAPs to inmates with the life-threatening medical

condition of severe Obstructive Sleep Apnea.

256.     Winchester executed this policy by denying Mr. Barlean's request for a

CPAP, causing him to suffer cruel and unusual punishment in violation of the Eighth

Amendment and the Due Process Clause of the Fourteenth Amendment.  Said denial

deprived Mr. Barlean of his right to bodily integrity and right to medical treatment by

causing the cessation of his ongoing, prescribed medical treatment for the life-threatening

condition of severe obstructive sleep apnea while confined at OCDC where Mr. Barlean

was totally reliant upon Turn Key for medical treatment.

257.     Turn Key's policy of not providing CPAPs to inmates caused Mr. Barlean

to suffer emotional and physical injuries and will continue to cause said injuries to all

current and future inmates at OCDC who have severe sleep apnea.  Turn Key and the Jail

Trust are liable for Mr. Barlean's damages resulting from their unconstitutional policy.

Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978).

258.     As a direct and proximate result of the unconstitutional official policy of

not providing prosthetic devices to inmates and its execution of said policy on Mr.

Barlean who was denied the provision of a CPAP, he suffered loss of liberty, physical

harm, experienced great physical pain, mental anguish and fear of imminent death,

emotional pain and suffering, and other grievous and continuing injuries and damages.

259.     WHEREFORE, Plaintiff demands judgment for compensatory and punitive

damages against the Jail Trust and Turn Key for their Monell violation, and, in addition

thereto, demands the award of attorney's fees and court costs pursuant to 42 U.S.C. §§

1983 and 1988 and demands a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, Mr. Barlean respectfully prays for judgment against Defendants, as to all causes of action as follows:

1.  Award of general, special and compensatory damages in an amount to be proven at trial, but in no event less than $8,600,000 U.S. Dollars

2.  Punitive Damages against individually named Defendants allowed by law;

3.  Attorneys' fees and court costs pursuant to 42 U.S.C. § 1988; and 42 U.S.C. §12205 and any other appropriate statute;

5.  Declare the contract between Jail Trust and Turn Key unconstitutional;

6.  Injunctive relief enjoining the performance of the unconstitutional contract until it is constitutionally repaired;

7.  Costs of suit incurred herein;

8.  Enter judgment against Defendants, jointly and severally, with pre-judgment interest from June 7, 2021, until the day of judgment;

9.  Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Kelly J. Barlean, *Plaintiff Pro Se*, OBA #31286
3101 N.W. 20th Street
Oklahoma City, OK 73107
405-326-7870
kellybarlean@gmail.com

FIRST AMENDED COMPLAINT - Page 54 of 54